**GUNDERSEN & SON, INC., Plaintiff,**

v.

**Albert L. COHN, et al., Defendants.**

**Civ. A. No. 71–0832–C.**

United States District Court,
D. Massachusetts.

Oct. 26, 1984.

Edmund M. Hurley, Joseph Walsh, White, Inker, Aronson, Connelly & Norton, Robert J. O'Regan, James Hamilton, David H. Lamson, Boston, Mass., for defendants.

David H. Lamson, Boston, Mass., for plaintiff.

## OPINION

CAFFREY, Chief Judge.

This is a civil action in which plaintiff, Gundersen & Son, Inc., a Massachusetts corporation, seeks to recover sums allegedly owed to it by defendants Albert and Sylvia Cohn, residents of New Jersey, for the construction of a summer home on the island of Martha's Vineyard. Defendants counterclaim for water damage to the house allegedly caused by plaintiff's faulty workmanship, and for the value of certain items of defendants' personal property which plaintiff allegedly removed from the construction site.

Plaintiff initially brought suit in state court, and defendants removed the case to federal court on the basis of diversity of citizenship. 28 U.S.C. §§ 1332, 1441. The case was then heard before a master, pursuant to Fed.R.Civ.P. 53. Both parties object to findings contained in the master's report, and the case is now before this Court on cross motions for judgment.

The central issue in this case is whether the parties agreed that plaintiff would build defendants' house for a predetermined maximum price, or whether they agreed that defendants would pay plaintiff's construction expenses plus a fixed profit margin, regardless of the total cost of the project. The master made numerous findings of fact concerning the communications between the pa..ies. Presented below is a summary of his findings, which are firmly supported by the evidence, along with certain additional facts which are also established by the Record.

In August, 1969, the parties met several times to discuss plaintiff's building a house for defendants on Martha's Vineyard. Master's Report, ¶ 13. Defendants showed plaintiff's representatives, Roy Gundersen and Earle Ray, their preliminary plans and specifications. Defendants also informed Mr. Gundersen and Mr. Ray that they wanted to pay no more than $90,000 for the house. Testimony of Roy Gundersen, Record at 1–71 (May 23, 1975). In order to bring the cost of the project under $90,000,

plaintiff's agents insisted that certain changes be made in the plans and specifications. Master's Report, ¶ 26. Defendants agreed to these changes, which included eliminating the garage, reducing the size of the deck, and using less expensive materials in many areas of the house. Master's Report, ¶ 27.

As a result of these discussions, plaintiff's agents prepared a letter of intent, to be signed by Mr. Cohn, authorizing plaintiff to proceed with construction. Master's Report, ¶ 16. This letter of intent, dated August 15, 1969, stated in part:

> It is our intention to enter into a formal contract with you within a period of 10 days based on The American Institute of Architects Agreement (AIA Document A 111), and the General Conditions of the Contract for the cost of the work plus a fee of 15% for overhead and profit. If for any reason whatsoever it is not possible to conclude the formal contract, we agree to pay you the net cost of (materials, labor, rental and cost of moving equipment). To the above costs will be added 15% for overhead and profit.... Upon execution of the formal contract this Letter of Intent shall be superseded by it.

Master's Report, ¶ 22.

Before signing this letter, Mr. Cohn added the following handwritten amendment: "Upset price is $90,000. Completion by June 1, 1970." Master's Report, ¶ 24. "Upset price," a term commonly used in the building trade, means a guaranteed maximum price given by a builder to an owner. Master's Report, ¶ 25.

Prior to August 27, 1969, defendants' architect, Norman Hoberman, filled out and sent to plaintiff a form contract drafted by the American Institute of Architects. Master's Report, ¶ 28. However, neither this contract, nor any other formal agreement was ever executed by the parties. Master's Report, ¶ 31 and ¶ 39.

By letter of August 27, 1969, Mr. Gundersen informed Mr. Cohn that he wished to amend several provisions of the proposed form contract. This letter concluded:

> Also, Addendum No. 1, dated 8/20/69, does not include all the changes that we discussed in setting the upset price at $90,000 and as yet we have not received the amended drawings dated 8/20/69, numbered Al-All, as specified in this article.
>
> We agree to this contract with the understanding that this letter becomes part of the contract documents and that if after we receive the amended drawings we find it necessary to increase the upset figure, any costs exceeding $90,000.00 would not be subject to the 15% for profit and overhead, but would represent only the cost of the work.

Master's Report, ¶ 30.

Plaintiff began construction of the Cohns' house in September of 1969. Master's Report, ¶ 35. The completed plans for the house, including the cost-cutting changes which plaintiff had suggested, were in plaintiff's possession by the middle of that month. Master's Report ¶ 34. After receiving these amended plans, plaintiff never found it necessary to increase the original upset figure of $90,000. Master's Report, ¶ 41; Testimony of Roy Gundersen, Record at 1–83, 84 (May 23, 1975).

On October 30, 1969, plaintiff's agent, Earle Ray, wrote Mr. Cohn a letter stating, in part:

> As per our conversation of 10/30/69, it is my understanding that we shall continue construction under the letter of intent originally agreed upon.
>
> However, upon completion of the exterior ... we shall meet and discuss in detail the interior finish schedule and at that time enter into a formal contract agreement with an upset price for completion.

Master's Report, ¶ 38.

From October 11, 1969 to September 21, 1970, plaintiff sent defendants fifteen invoices, totalling $116,124.73. Master's Report, ¶ 42 and ¶ 44. Plaintiff admits, however, that defendants were inadvertently overcharged $3,500.00. Master's Report,

¶ 49. Therefore, total billing for the job should have been $112,624.75.

From October 11, 1969 through May 11, 1970, each of plaintiff's invoices included a 15% fee for overhead and profit. On the invoice of May 11, 1970, however, there appeared for the first time a calculation of the total cost of the project to date. This invoice indicated that defendants had been billed a total of $90,117.62. All subsequent invoices charged for labor and materials only and did not include a 15% fee. Master's Report, ¶ 42 and ¶ 43.

The Cohns paid plaintiff a total of $91,123.97 for the construction of the house. Defendants submitted their last payment to plaintiff on June 29, 1970. Master's Report, ¶ 3. Thereafter, defendants refused to make any further remittances.*

Defendants moved into their new summer home in the late spring of 1970. Soon after taking up residence, they observed water leaking into the structure and staining the interior. The walls became damp and musty, some floors became warped and blackened, and the staining worsened with every storm. Master's Report, ¶ 56–58. Mr. Gundersen became aware of the problem before the house was finished, but he was unable to determine the cause of the leaks. Master's Report, ¶ 55. The leakage continued until the summer of 1974 when Carmen Ciancio, a carpenter hired by Mr. Cohn, located the source of the problem. Mr. Ciancio discovered that the metal capping on the top of the roof had been cut by a knife or a saw, allowing water to penetrate the roof. Master's Report, ¶ 59–61. While building the house, plaintiff's workmen had used either a skillsaw, a razor knife, or a carpenter's saw to trim the shingles at the top of the house. Master's Report, ¶ 62. Mr. Ciancio repaired the roof and eliminated the leaks by attaching a saddle board to the ridge of the roof. Master's Report, ¶ 63–64. The master found that the water damage to the house can only be repaired by replacing all the affected wood, and that the reasonable cost of replacement is $17,800. Master's Report, ¶ 65–66.

### Plaintiff's Claim

Plaintiff alleges that defendants still owe $21,500.78 for the construction of their summer home. Plaintiff bases its claim on alternative theories. First, it asserts that it is entitled to recover in *quantum meruit*, because the parties never entered into a formal contract establishing a price for the work. Second, plaintiff contends that, if the parties did agree on price, they agreed that defendants would pay plaintiff its expenses plus 15% for overhead and profit. Defendants do not dispute that they agreed to pay plaintiff the cost of construction plus 15%. They maintain, however, that the parties also agreed to a ceiling price of $90,000, an amount which plaintiff has already received.

■ On the basis of the facts set forth above, I find that the parties agreed to an upset price of $90,000 for the construction of the house. From the outset of negotiations between the parties, defendants insisted that plaintiff build the house for $90,000. In order to meet this financial limitation, plaintiff required that defendants substantially alter their preliminary plans. Defendants agreed to make the numerous changes which plaintiff recommended. These initial actions indicate that the parties viewed the $90,000 figure as a common goal.

The content of the parties subsequent correspondence confirms the existence of a price agreement. Mr. Cohn expressed his own understanding of the price terms when he amended the August 15th letter of intent to include the $90,000 upset figure. Mr. Gundersen subsequently wrote Mr. Cohn, stating:

> Addendum No. 1 ... does not include all the changes that we discussed in setting the upset price at $90,000 .... *We*

---

* The amount which defendants have paid in excess of $90,000 is not a subject of dispute in this case.

*agree to this contract with the understanding that ... if after we receive the amended drawings we find it necessary to increase the upset figure,* any costs exceeding $90,000 would not be subject to the 15% for profit and overhead, but would represent only the cost of the work. (Emphasis added).

This letter plainly indicates that Mr. Gundersen agreed to build the house for a maximum price of $90,000, subject to any increase which the amended plans might necessitate. Mr. Gundersen had the amended plans in his possession by mid-September. He himself testified that, after examining the amended plans, he never felt compelled to increase the upset figure which the parties had originally established. Therefore, the express condition which would have nullified plaintiff's assent to the $90,000 upset price never materialized.

Mr. Ray's letter of October 30th does not alter the parties' agreement as to price. I find that this letter is merely an ineffective attempt by plaintiff to revoke its previous assent to the upset figure of $90,000.

■ Determining that the parties agreed to a maximum price of $90,000 for the construction of the summer house does not end the inquiry in this case. It is also necessary to decide whether they intended to be bound by their agreement prior to the execution of a formal contract. The correspondence between plaintiff and defendants, set forth above, shows that they had planned to formalize their agreement. Whether parties who contemplate executing a formal contract intend to be bound by their informal agreements in the absence of such a document depends on the circumstances of the case. Restatement (Second) of Contracts, § 27. "The inclusion of a provision for the later drawing up of a formal memorial of the terms of an agreement, written or oral, is not necessarily inconsistent with an intent to be presently bound to an agreement in its original informal state." *Nigro v. Conti,* 319 Mass. 480, 482, 66 N.E.2d 353 (1946).

■ In this case, I find that the parties did intend to be bound by the agreement which they reached in August of 1969. Plaintiff's construction team began working full time on defendants' house in September of that year. It is inconceivable that Mr. Gundersen and Mr. Ray would have authorized such action had they not believed that defendants were contractually bound to pay them for their work. The Cohns, in turn, sent plaintiff monthly payments, many of which exceeded $10,000, until the $90,000 limit was reached. Defendants' conduct indicates their understanding that they were legally obligated to pay plaintiff as much as $90,000 for the construction of their house.

Because I find that the parties agreed on an upset price of $90,000, and I further find that they intended their agreement to be binding, I rule that plaintiff's claim for $21,500.78 should be denied.

### Defendants' Counterclaims

Defendants assert two counterclaims. First, they contend that the house which plaintiff built for them was not constructed in a workmanlike manner. Defendants claim that, as a result of plaintiff's faulty workmanship, water leaked into the house and caused extensive damage to the interior of the structure. Second, defendants allege that, during construction, "certain items of personal property owned by the ... [defendants] were taken by the agents or servants of the ... [plaintiff] corporation." Defendants' Counterclaim III, ¶ 2.

■ With regard to defendants' first counterclaim, the master found that the Cohns did not take diligent steps to mitigate the damage which resulted from the leakage problem. This finding is supported by the evidence. Although defendants quickly discovered that living in the house "was like living in a boat," Testimony of Sylvia Cohn, Record at 4–109 (July 23, 1976), and that the damage worsened with every storm, *Id.* at 4–106, defendants saw fit to hire only two repairmen to investigate the problem in a period of four years. Testimony of Albert Cohn, Record

384

at 5–74, 75 (October 16, 1976). Defendants' architect, Norman Hoberman, was also made aware of the leakage, but his attempt to find its source did not extend to an examination of the roof. *Id.* at 5–76. Because I rule the master was correct in finding that defendants failed to mitigate the water damage to the house, I rule that defendants' first counterclaim should be denied.

I further rule that defendants' second counterclaim, for personal property allegedly taken by plaintiff, should also be denied. The master found that he could not assess damages on this counterclaim because the Cohns had produced no probative evidence of the value of the items allegedly taken. Master's Report ¶ 7. A review of the Record indicates that defendants not only failed to prove the value of the property in question, but also failed to show plaintiff's responsibility for its removal.

For the reasons set forth in this opinion, I rule that both plaintiff's claim and defendants' counterclaims should be denied.

Order accordingly.

