Mike DOLL, Ronald Elbon and Kent Langworthy, Plaintiffs–Appellants,

v.

GRAND UNION COMPANY, Defendant–Appellee.

No. 89–8682.

United States Court of Appeals, Eleventh Circuit.

March 11, 1991.

Walter B. Russell, Jr., Russell & Russell, Decatur, Ga., for plaintiffs-appellants.

Michael Smith, Ralph Allen Pitts, King & Spalding, Atlanta, Ga., for defendant-appellee.

Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge, and ESCHBACH *, Senior Circuit Judge.

TJOFLAT, Chief Judge:

The appellants, Mike Doll, Ronald Elbon, and Kent Langworthy, are partners in a real estate development business in Atlanta, Georgia. The Grand Union Company, the appellee, owns and operates a chain of supermarkets, the Big Star Food Stores. The appellants brought this suit against the appellee after it refused to sign a lease for a food store in a shopping center they were trying to develop and the project failed. Advancing several theories of liability, the appellants sought to recoup the money they had spent on the project and lost, and the rent the appellee would have paid them had it signed the lease. The district court found no merit in any of their

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

theories, and granted the appellee summary judgment. We affirm.[1]

### I.

### A.

In 1984, the Grand Union Company (Grand Union) conducted a marketing survey of the greater Atlanta area. Based on this survey, Grand Union concluded that the intersection of Memorial Drive and Hairston Road in Dekalb County offered an ideal location for a new Big Star Food Store. Raymond Ayers, a vice president at Grand Union, asked one of his former employees, Lewis Allen, to contact the developers in the area who might be interested in building a shopping center at that location, with Grand Union as the primary tenant. One of the people Allen contacted was an individual named Frederick Ross. Ross was a friend and former business associate of appellant Mike Doll; at the time, Doll and appellants Ron Elbon and Kent Langworthy, as partners, were operating a real estate development firm, Great South Realty. Ross, Doll, and Doll's partners liked Allen's proposal and decided to join forces, acquire the land at the Memorial Drive and Hairston Road intersection, and build the shopping center; they called themselves, and their venture, the Hairston Run Partners (the partners or the partnership).

The land needed for the shopping center consisted of several parcels. The partners promptly contacted the owners of these parcels and, after a period of several months, obtained options[2] to purchase their land. The partners entered into these contracts without a binding commitment from Grand Union to lease space in the proposed shopping center; in fact, all they had from Grand Union was an "indication of interest" in having a food store there.

Although the two sides differ in their characterizations of the strength of Grand Union's interest in locating at the shopping center, it is clear that at the very least Grand Union indicated a strong desire to lease space in the facility and that the partners regarded Grand Union as their lead or anchor tenant. It is also clear that, until May 1986, the parties' discussions were merely preliminary in nature, dependent on the resolution of several issues, and that, as Ayers informed Ross, who was negotiating the lease for the partnership, Grand Union's real estate board would have to approve the deal before Grand Union could proceed. The key issue to be resolved was access to Grand Union's food store. For the food store to be successful, it was imperative that the store's customers be able to turn left easily from Memorial Drive into the store and from the store onto Memorial. At the time, the Memorial Drive and Hairston Road intersection was not controlled by a traffic signal, making such entry and exit difficult.

On May 22, 1986, Ayers sent a letter to Ross notifying him that Grand Union's real estate board had approved the project. The letter contained some of the basic provisions of the agreement negotiated by the parties up to that point, including the size of the store, the term of the lease and renewal option, and the rent. The letter also noted that the board's approval was subject to three contingencies, one of which concerned the satisfactory resolution of the automobile access issue, and it concluded by stating that "[t]he above is subject to the resolution of a mutually agreeable lease document and its execution by both the partnership and Grand Union."

---

1. In reviewing the trial court's grant of summary judgment, we consider the record in the light most favorable to the nonmoving party (here, the appellants) and determine whether that party has demonstrated the existence of a genuine issue of material fact. *Browning v. Peyton,* 918 F.2d 1516 (11th Cir.1990). Unless there is evidence in the record on which a jury could return a verdict for the nonmoving party, summary judgment is appropriate. *Anderson v. Lib-* *erty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

2. The precise nature of these contracts is not clear; for convenience, we refer to them as options. The important point for our purposes is that the partners paid earnest money for the right to purchase the parcels and lost all or a part of it when the project fell through.

Grand Union admits that these contingencies were ultimately resolved by the parties. The negotiations over the specifics of the lease agreement, however, bogged down—resulting in considerable delays in the completion of an acceptable draft. As a result, a final draft of the lease agreement could not be completed until early December 1986; on December 4, Neill Thompson, Grand Union's regional real estate manager, mailed his last revisions of the agreement to the partners, stating "I am sure you share my relief in a final resolution on this document."

Before the partners had an opportunity to incorporate these revisions into the lease and sign it, the Georgia Department of Transportation (DOT) announced a plan to build a concrete median down the middle of Memorial Drive, which would block access to the shopping center. The parties learned of the DOT's plan sometime in early December, just after Thompson sent his final revisions to the partners. In the weeks that followed, the partnership attempted to gain DOT approval for a median cut to allow traffic to cross Memorial Drive and enter the shopping center. Meanwhile, Grand Union entered into discussions with another group of developers to secure space in a shopping center they planned to build just across Hairston Road. This site would have access from Hairston Road and thus a food store there would not be as adversely affected by the construction of a median. On January 26, 1987, while the partners were still trying to secure approval for a cut in the median, Ayers sent a letter to the partnership informing it that, because of the problems caused by the DOT's plan, Grand Union could no longer proceed with the deal. The partners, already encountering some financial difficulties, attempted to find another lead tenant to replace Grand Union or, if they were unsuccessful, another developer to take over the project. When these efforts failed, they brought this suit against Grand Union—to recover the losses they had sustained as a result of its refusal to sign a lease.

### B.

In their complaint, the partners[3] asserted three theories of recovery.[4] First, in count one, they maintained that, although the parties failed to sign a formal lease agreement, they entered into an agreement to sign a lease, which, under Georgia law, created a binding obligation to abide by the terms of the lease they intended to sign. Second, the partners claimed that Grand Union's repeated indications of interest in making a lease constituted a promise on which they relied to their detriment, a promise which, they suggest, is enforceable under the doctrine of promissory estoppel. Finally, in count three, the partners alleged that, unlike the typical shopping center development project, they prepared this site specifically for Grand Union and that during the course of the nearly year and a half of negotiations a confidential relationship resulted which created a duty of good faith; Grand Union purportedly breached this duty when it backed out of the project. As damages, the partners asked for $550,-000 to compensate them for the sums they expended in developing the shopping center site and, in addition, $4.5 million to compensate them for the profits they would have earned under the lease with Grand Union.

Grand Union answered the partners' complaint with a general denial of liability and, as an affirmative defense, asked that the complaint be dismissed for failure to state a claim for relief. Following discovery, Grand Union moved for summary judgment. The district court granted its motion. The court rejected the partners' argument, advanced in support of count one, that Ayers' May 22 letter to Ross constituted an agreement to make a lease; in the court's view, the letter was not meant to serve as a contract in and of itself, but was, instead, designed merely to

---

**3.** Frederick Ross did not join his three partners in bringing this suit. Consequently, our references *infra* to the partners, as the appellants, do not include Ross.

**4.** These theories were asserted in counts one, two, and three of the complaint. The complaint contained six counts in all, but only the first three are involved in this appeal.

formalize Grand Union's expression of interest without creating a binding obligation. With respect to count two, the court concluded that Ayers' statement in the letter—that the real estate board's approval of the project was "subject to the resolution of a mutually agreeable lease document and its execution" by the parties—made the partners' reliance on the letter as a promise unreasonable. Finally, as for count three, the court found no merit in the partners' argument that the dealings between the parties and the existence of a common goal created a relationship of mutual confidence and a duty of good faith. Following the entry of final judgment for Grand Union, the partners took this appeal.

## II.

### A.

In count one of their complaint, the partners alleged that the combination of correspondence and oral communication between the parties resulted in the formation of an agreement to lease the property on the northwest corner of Memorial Drive and Hairston Road. Although they admit that Grand Union never specifically promised to execute a lease, they contend that there was sufficient evidence from which a jury could infer the existence of such an agreement.

The principal piece of evidence relied on by the partners is the May 22, 1986 letter written by Grand Union's vice president, Raymond Ayers. The letter informed them that the real estate board at Grand Union had approved the proposed shopping center site, and it set forth the terms of an acceptable lease.[5] These terms essentially echoed those stated in a May 7, 1986 letter that Doll wrote to Grand Union.

The partners also rely on what they describe as numerous occasions on which Grand Union expressed its desire to enter into a lease agreement with them. At one point, the partners apparently felt that the risks inherent in the project were simply

too great to proceed without a strong commitment from Grand Union. Ross therefore went to Ayers to try to obtain a less equivocal statement of Grand Union's intent. Ayers apparently told him that although the partners would have to analyze the risks on their own, he felt certain that Grand Union could make the deal worthwhile for them. When, subsequently, Ross sought financial assistance for the partnership from an old business associate, Tom Kennedy, Kennedy called Ayers and Ayers assured him that Grand Union had every intention of reaching an agreement with the partners. Taken as a whole, the partners maintain that this evidence created an agreement to sign a lease.

Grand Union responds by contending that the May 22 letter and the many oral communications that preceded and followed it constituted, at best, an agreement to agree. They note that while the basic terms of the formal lease agreement were set out in Ayers' May 22 letter, numerous contractual issues remained to be resolved. In fact, at several points during the partners' discussions, they encountered issues on which there was serious disagreement. Over the nearly six months of negotiations, a "gillion" drafts of the lease were exchanged. Grand Union suggests that such evidence demonstrates that the parties clearly did not intend to be bound, as of May 22, 1986, by their preliminary discussions, but instead envisioned the continuation of negotiations leading to a mutually acceptable lease agreement. Grand Union points to clear authority in Georgia which holds that agreements to agree or preliminary statements of intent to contract in the future are unenforceable. *See, e.g., Hartrampf v. Citizens & S. Realty Investors,* 157 Ga.App. 879, 278 S.E.2d 750, 752 (1981) (unless agreement leaves nothing to future negotiations it is unenforceable); *Nuclear Assurance Corp. v. Dames & Moore,* 137 Ga.App. 688, 225 S.E.2d 97, 98 (1976) (agreements to negotiate in future are not binding); *Malone Constr. Co. v. Westbrook,* 127 Ga.App. 709, 194 S.E.2d 619, 620

---

**5.** Although Ayers' letter also contained three specific contingencies, Grand Union admits that all three were resolved to its satisfaction either at the time the letter was written or shortly thereafter.

(1972) (same); *Russell v. City of Atlanta*, 103 Ga.App. 365, 119 S.E.2d 143, 144 (1961) (same). Grand Union maintains that the parties were merely sketching the outlines of an agreement and clearly did not come to an understanding on all the terms of the lease. Unless all the terms were finalized, Grand Union contends that no agreement can be found. *See American Viking Contractors v. Scribner Equip. Co.*, 745 F.2d 1365, 1369–70 (11th Cir.1984) (in Georgia, unless all terms and conditions are agreed upon, no binding obligation arises).

The partners, however, suggest that the case law cited by Grand Union is not applicable to agreements to lease. They maintain that in order to enforce such agreements, the parties need only specify the *essential* terms of the lease. A meeting of the minds need not be reached as to every provision. An agreement to execute a lease, they note, is not intended to be the lease itself, but is instead designed to express the intentions of the parties as to the essential terms of a lease to be executed in the future. Indeed, the Georgia courts have unambiguously held that such agreements are enforceable despite the parties' failure to sign an actual lease containing the details of the agreement. As long as the court can extract the essential terms of the lease from the contract to sign the lease, the contract will be enforced.

In *Kaplan v. Krantz*, 202 Ga. 194, 42 S.E.2d 371 (1947), for example, the Supreme Court of Georgia enforced a contract to sign a lease that had not been executed. The plaintiff in that case purchased a store from the defendant. In the contract of sale, the plaintiff received an option to lease the property adjoining the store for a period of three years at a specified rent. When the plaintiff sought to exercise the option, however, the defendant refused to sign a lease. The court held that it would enforce the agreement as long as the essential terms of the lease were evident from the contract; an executed lease form was not necessary. *Id.* 42 S.E.2d at 373.

The facts in *Shell Petroleum Corp. v. Jackson*, 47 Ga.App. 667, 171 S.E. 171 (1933), bear a remarkable resemblance to the present situation. The plaintiffs in that case owned a piece of property on which the defendant wished to build a service station. The plaintiff made two proposals to the defendant, both of which granted the defendant a ten-year lease but on slightly varying terms. The defendant accepted one of the proposals, and the plaintiff began to clear the site for construction. The plaintiff then prepared and signed a lease incorporating the basis of their agreement and forwarded it to the defendant. The defendant, however, maintained that upon closer analysis it had determined that the rent was too high, and it refused to sign the lease. The court concluded that the parties reached an agreement to lease and the defendant's refusal to sign the lease constituted a breach of that agreement. *See also Matlock v. Duncan*, 220 Ga. 200, 137 S.E.2d 661, 663 (1964) (oral agreement to lease specified consideration, subject matter, and purpose and thus was enforceable despite parties' failure to execute completed lease agreement); *Merry v. Georgia Big Boy Management, Inc.*, 135 Ga.App. 707, 218 S.E.2d 694, 696 (1975) (oral agreement to lease contained essential terms and was enforceable despite failure to sign written lease). The approach taken by the Georgia courts in this area is not without support elsewhere in the nation. *See, e.g.,* 51C C.J.S. *Landlord and Tenant* § 190 (1968 & Supp.1990); Annotation, *Requirements as to Certainty and Completeness of Terms of Lease in Agreements to Lease*, 85 A.L.R.3d 414 (1978).

Naturally, the partners contend that the written and oral communications between the parties clearly articulated the essential terms of their understanding. By concentrating on the level of specificity required to create a binding lease agreement, however, the partners have ignored the primary question concerning whether the parties intended that their preliminary negotiations create a binding legal obligation. Unless the parties intended to be bound by the statements they made during these negotiations, they did not enter into a contract to sign a lease. Every possible provision of a contemplated lease may be dis-

cussed and agreed upon, but unless the parties intend that these discussions be binding, no contract has been formed. When the parties express their intention to be bound and they specify the basic terms of the lease, the courts will enforce the contract, and thus the lease, to avoid frustrating the parties' original intent. When such indications of intent are absent or are explicitly disavowed, however, the justification for enforcing the proposed lease is wholly absent. The court does not address the terms of the proposed lease until it has satisfied itself that the parties did indeed intend to be bound. *See Gunderson & Son, Inc. v. Cohn,* 596 F.Supp. 379, 383 (D.Mass.1984) (under Massachusetts law, whether parties are bound by informal initial agreements is question of intent); *cf. John Bleakley Ford, Inc. v. Estes,* 164 Ga.App. 547, 298 S.E.2d 270 (1982) (although both parties intended agreement to be binding, agreement was unenforceable as parties failed to specify essential terms).

■ The partners acknowledge that, unlike the cases on which they rely, Grand Union never explicitly promised to sign a lease. Instead, they suggest that an agreement to sign a lease can be inferred from the circumstances surrounding the discussions between the parties. Such an inference, however, is entirely unwarranted in light of Grand Union's clear and unambiguous expression of its intention not to bound. The May 7 letter from Doll to Ayers requested that Ayers sign and return the letter indicating his consent to the terms contained therein. Such a letter, signed by Ayers, could conceivably represent the requisite indication of intent to be bound and could therefore create an agreement to sign a lease. *See, e.g., Chase v. Consolidated Foods Corp.,* 744 F.2d 566, 571 (7th Cir.1984) (under Illinois law, letter of intent could serve as enforceable contract if parties so intended). Ayers, however, never signed the letter. Furthermore, the letter Ayers sent to the partnership on May 22 unmistakably stated that Grand Union did not intend to be bound by

any of the terms announced in the letter until a complete and final lease agreement had been signed by the parties. In fact, every version of the lease exchanged between the parties included a clause which stated that the lease would not become final until it had been fully executed.

The former Fifth Circuit faced a similar situation in *Dumas v. First Federal Savings & Loan Association,* 654 F.2d 359 (5th Cir. Unit B Aug. 1981) (applying Georgia law).[6] The plaintiff in *Dumas* alleged that a letter which contained the details of a proposed purchase and which was initialed by both parties created a binding contract. The letter stated that it was to "act as the basic agreement, subject to a mutually acceptable Purchase and Sale Agreement." The court concluded that the defendant clearly did not expect that it would be bound by the terms in the letter in light of the language conditioning a final agreement on the execution of a mutually acceptable contract. Although *Dumas* did not involve an agreement to lease and the court did place emphasis on the fact that all terms and conditions must be agreed upon under traditional principles of Georgia contract law, the court's analysis of the conditional nature of the letter is still instructive. Language which conditions the terms discussed on the execution of a finalized document relates directly to the intentions of the parties. The fact that the *Dumas* court required that every term be agreed upon rather than simply the essential terms does not affect its analysis of the preliminary issue concerning intent. As that court stated: "The letter agreement states on its face that it is subject to a later, 'mutually acceptable' agreement; *the provision can only mean that the parties did not intend the letter agreement to be a binding, enforceable contract." Id.* at 361 (emphasis added); *see also In re Harvey Probber, Inc.,* 50 B.R. 292 (Bankr.Mass. 1985) (letter between lender and borrower did not create contractual relationship where letter also indicated intention not to

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the deci-

sions of the former Fifth Circuit handed down prior to October 1, 1981.

be bound until completed contract executed).

■ There is evidence in the record to suggest that even the partners realized that Grand Union had not committed itself. Doll, in his deposition, stated that he had been dissatisfied with Ross for his failure to finalize an agreement with Grand Union and other tenants. His dissatisfaction and discomfort suggest that he knew that without a completed lease agreement the partnership would be exposed to considerable risk. It certainly was not impossible for a lease agreement to be concluded prior to the time the partnership put down its largest nonrefundable earnest-money payment on the land it had contracted to purchase or before it obtained financing from Tom Kennedy. In fact, although there is some dispute in the record concerning this point, Ross stated that a lease *had* been completed with another lessee, General Cinema, contingent only on the finalization of the agreement with Grand Union. Moreover, Doll stated that it had been the intention of the partners to have all such leases completed well before the nonrefundable development costs had been incurred to provide what he described as a "comfort factor." The partners, therefore, knew that without a signed lease they could not be sure that the deal would go through, and although Grand Union did indeed express its willingness and desire to proceed with the project, it steadfastly maintained that it would not be bound until an agreement had been signed. The partners cannot contend that despite these specific statements to the contrary, the parties actually entered into an agreement to sign a lease.[7] *See also Hartrampf,* 278 S.E.2d at 752 ("Where it is evident from a written instrument, that the parties contemplated that it was incom-

plete, and that a binding agreement would be made subsequently, there is no agreement.") (quoting *Board of Drainage Comm'rs v. Karr & Moore,* 157 Ga. 284, 121 S.E. 298 (1923)); *Russell,* 119 S.E.2d at 144 (where facts reveal that parties did not intend to be bound until contract signed, court will not enforce agreement).

■ Courts are often willing to infer terms and conditions in contract analysis if certain factual predicates are present. Courts will even enforce an unexecuted agreement if it appears that the parties have expressed their assent. *See Barton v. Chemical Bank,* 577 F.2d 1329, 1336 (5th Cir.1978) (whether oral contract may be enforceable even when parties contemplate execution of written agreement is question of intent). In such a situation, the court is merely enforcing what the evidence suggests was the intent of the parties. Yet, when the parties make their intentions clear, there is no basis for a court to step in and contradict their explicit desires. A court surely would not infer consent to an unsigned agreement when the parties clearly predicated a binding agreement only on the actual execution of the contract. So here we are unwilling to allow a jury to infer an agreement to sign a lease when one of the parties specifically declared its intention not to be bound until a lease was drafted and signed by both parties.[8]

B.

The partners also claim that the trial court erred in granting Grand Union summary judgment on their promissory estoppel claim. They maintain that even if we are unwilling to find that Grand Union breached a contractual obligation, we

---

**7.** Due to our resolution of this issue, we need not address the parties' arguments concerning the applicability of the statute of frauds.

**8.** Even if we were to find that the partners and Grand Union entered into an agreement to sign a lease, it is not entirely clear that the partners would prevail. At least one Georgia case appears to suggest that an agreement to sign a lease creates only a tenancy at will. *See Plank v. Bourdon,* 173 Ga.App. 391, 326 S.E.2d 571, 574 (1985) (executory agreement to make a

lease results in tenancy at will terminable by either party with thirty days notice). Admittedly, however, it is unclear whether the court held that the agreement to lease was unenforceable and thus created a tenancy at will or whether it held that even a binding agreement to lease would create such a relationship. *See also Merry v. Georgia Big Boy Management, Inc.,* 135 Ga.App. 707, 218 S.E.2d 694, 697 (1975) (*oral* agreement to lease creates tenancy at will).

should conclude that the equitable doctrine of promissory estoppel renders Grand Union liable.

■ The Georgia legislature adopted the doctrine of promissory estoppel as articulated in section 90 of the Restatement (Second) of Torts in 1981. *See* Ga.Code Ann. § 13–3–44(a) (1982).[9] Georgia courts, however, had utilized the doctrine long before this time. *See, e.g., Insilico Corp. v. First Nat'l Bank,* 248 Ga. 322, 283 S.E.2d 262 (1981) (citing precodification cases). To prevail on a promissory estoppel claim, a plaintiff must demonstrate that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiff would rely on such promises, and (3) the plaintiff did in fact rely on such promises to his detriment. *See* Ga.Code Ann. § 13–3–44(a).

■ Essentially, the partners support their promissory estoppel claim with the same evidence they used to support their breach of an agreement to lease claim. Again, they admit that Grand Union made no explicit promises but maintain, instead, that the record as a whole presents sufficient evidence of assurances by Grand Union to justify their reliance. Ross testified, on deposition, that Grand Union constantly reiterated its interest in the property; when, for example, he told Grand Union that the partnership had doubts about proceeding with the project, Ayers told him that Grand Union would "make the economics work out." Most importantly, the partners, as they repeatedly stated in their depositions, believed the May 22, 1986 letter from Ayers constituted a letter of intent and thus a promise to enter into a lease. Although the partners had incurred

some initial expenses prior to receiving that letter, it is obvious that they would not have proceeded with the project in the absence of what they perceived as a promise to conclude a lease agreement. In the aggregate, this evidence is more than sufficient to create a jury issue as to whether a promise was made by Grand Union.

More problematic, however, is the question of the reasonableness of the reliance the partners placed on this alleged promise. Central to the resolution of this issue is a determination of the significance to be given to the conditional language contained not only in Ayers' May 22 letter but in each draft of the lease as well. These documents clearly articulated Grand Union's desire *not* to be bound until the final draft of a lease was executed.

In an endeavor to convince us that the partners' reliance on its statements of intent was not reasonable, Grand Union attempts to fabricate a rule that finds promissory estoppel inapplicable to agreements to agree and other unenforceable quasi-contractual agreements. To do so, it relies on a hodgepodge of equitable estoppel cases, fraud cases, and a unique promissory estoppel rule that clearly applies only in the context of insurance contracts. According to Grand Union, this "powerful and consistent line of state and federal Georgia cases" holds that agreements to agree can never, as a matter of law, support a promissory estoppel claim. This illusory doctrine is created by taking quotations out of context and by simply deleting references to the actual body of law the court was addressing in order to create the impression that the quotations used apply to the doctrine of promissory estoppel.[10] Grand

9. The Code provides:

   (a) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

10. For example, the attorneys for Grand Union took the following language from *American Viking,* 745 F.2d at 1372:

> Again, Scribner's alleged promise to restructure AVC's debt was merely an agreement to agree in the future; a nullity under Georgia law. A promise which is unenforceable cannot be reasonably relied upon....

The end of the sentence which counsel conveniently omitted states "and thus cannot form the basis for *an action in fraud.*" (Emphasis added.) While an attorney might reasonably argue that the element of reliance involved in the two actions is similar, the complete failure to advise the court that language which appears to be controlling on its face is actually referring to an

Union urges the court to find that unless the agreement between the parties is legally enforceable, promissory estoppel is an inappropriate avenue for recovery. Such a holding would utterly eviscerate the doctrine of promissory estoppel which was designed specifically to address cases where the plaintiff has no legally enforceable rights but has suffered a loss due to reliance on the defendant's promises. *See 20/20 Vision Center, Inc. v. Hudgens*, 256 Ga. 129, 345 S.E.2d 330, 335 n. 7 (1986) (doctrine provides avenue of recovery when legal impediments would otherwise prevent plaintiff from pursuing cause of action).

What the cases cited by Grand Union do hold is that certain promises may be so vague and uncertain that reliance on them would not be reasonable. *See, e.g., American Viking*, 745 F.2d at 1372. That is clearly not the case here. The partners have argued, and Grand Union has not seriously disputed, that the essential terms of their contemplated lease agreement were set out in the May 22 letter. Surely a promise premised on such explicit terms is certain enough to survive this hurdle, and it cannot be said that the letter, taken together with the other oral promises and assurances Grand Union purportedly made, was too indefinite or uncertain to make reliance reasonable. Clearly, some agreements to agree or promises from one party to another are so sketchy or general that a finding of reasonable reliance would be unwarranted. Here, however, the promise made by Grand Union is far more than a general statement of intent.

Although we are unwilling to lay down any general rule prohibiting promissory estoppel claims in the context of agreements to agree, the partners still must demonstrate that they acted reasonably in relying on Grand Union's statements. This is not an easy task in light of the company's repeated caveats that it did not intend to be

bound until a final lease agreement was signed. This type of conditional language is different from a mere agreement to agree. Parties may indicate their intention to complete an agreement in the future without conditioning their position on the execution of a formalized document. In fact, it appears wholly contradictory to assert that Grand Union "promised" to sign a lease while simultaneously insisting that only a completed document would serve to bind it. The question, therefore, is whether it was reasonable for the partners to rely on Grand Union's assurances in light of this condition.

The partners claim that the decision of the Georgia Supreme Court in *20/20 Vision Center, Inc. v. Hudgens*, 345 S.E.2d 330, 335 (Ga.1986), indicates that the presence of such conditional language does not prevent a finding of reasonable reliance. As they note in their brief, however, promissory estoppel claims are extremely fact-specific and are not susceptible to the application of generalized rules. In *Hudgens*, the plaintiffs had already negotiated the major terms of the lease and had exchanged drafts with the defendant before the latter's attorney began emphasizing that the terms set out in the letters between the parties were "subject to negotiation, execution and delivery of a written lease." In addition, a similar clause in the lease itself was only inserted in the final drafts of the agreement. Although the Georgia Supreme Court did not analyze the facts in any detail, it appears that the court reversed the grant of summary judgment because the plaintiffs had *already* relied on the defendant's promises before the conditional language began to appear. In addition, the plaintiffs in *Hudgens* did not even raise a promissory estoppel claim at the trial court level. Although the supreme court stated that there were "triable issues of fact" under the doctrine of promissory estoppel, its holding technically was not a

---

entirely separate cause of action is extremely misleading. Although the court in *American Viking* had dispensed with the plaintiff's promissory estoppel claim, it had done so by holding that the promises made by the defendant were too indefinite to justify reasonable reliance, a far cry from holding that only legally enforce-

able obligations can form the basis of promissory estoppel claims. In fact, as is clear from the discussion which follows, reliance in the context of promissory estoppel need not be predicated on a legally enforceable obligation. If that were the case, the doctrine itself would be rendered nugatory.

reversal of the trial court's grant of summary judgment, but a remand for consideration of the case under a promissory estoppel theory. Presumably, the trial court would have been justified in dismissing the case on remand as long as it explicitly addressed the feasibility of a promissory estoppel claim.

In this case there is simply no basis for the contention that the partners' reliance was reasonable. To hold otherwise would render potential tenants like Grand Union incapable of protecting themselves against liability during the course of negotiations. It is difficult to imagine what else Grand Union could have done to pursue the project in this case while simultaneously avoiding being bound until a lease was signed. To allow a promissory estoppel claim to proceed in this context would be to allow equity to denigrate a term expressly bargained for between the parties. It is important to remember that this clause also had an upside for the partners as well. If during the course of negotiations, another grocery chain had offered the partnership a higher rent than Grand Union, they would have been free to accept it.

Grand Union did indeed make promises to the partners. It promised them that it was interested in leasing space in their development. It promised them that it planned to pursue negotiations. It promised them that it had every intention of finalizing an agreement with them. What Grand Union also made clear was that despite its interest in the site and its desire to consummate a long-term lease, it had no intention of becoming obligated until the lease was drafted, approved, and signed by both parties. The partners' reliance on Grand Union's statements of intent in light of their conditional nature clearly was unreasonable. *See Protective Life Ins. Co. v. Robinson,* 193 Ga.App. 316, 387 S.E.2d 603, 605 (1989) (promissory estoppel does not transform a conditional promise into an unconditional promise).

■ Even if we were to find that Grand Union made a promise to sign a lease and that the partners' reliance was reasonable, we still would not find in their favor. Promissory estoppel is an equitable doctrine designed to prevent the intricacies and details of the law from frustrating the ends of justice. The Georgia statute provides that promises that reasonably induce reliance are binding *"if injustice can be avoided only by enforcement of the promise."* Ga.Code Ann. § 13–3–44(a) (emphasis added). In this case, Grand Union pursued a lease for this property with genuine enthusiasm. Its decision to pull out of the negotiations was due not to bad faith, but to the occurrence of an independent event, unforeseen by either party, which destroyed one of the essential elements of the negotiation—access to the shopping center. The DOT's plan dramatically altered the context in which the parties had negotiated an agreement and undermined the basis of the bargain Grand Union thought it would receive. The partners knew all along that automobile access to the shopping center was crucial to the deal. In fact, it appears that the partners knew that the deal was in peril as soon as the DOT's plan was announced.

■ In an equitable action such as count two, the question is who should be responsible for bearing the burden caused by this unforeseen event. Grand Union appears to have protected itself from just such a contingency by subjecting its approval of the deal to the execution of a mutually acceptable lease. When the parties have apportioned the risk among themselves, a court should be hesitant to step in and contravene their explicit agreement. Due to an unforeseen event outside the control of either party, one party must bear the burden. Either Grand Union is forced to occupy a mall with substantially decreased access or the partners are required to find another tenant. In this case, where neither party is to blame, we are content to let the burden remain with the partners.[11]

11. In fact, considering that access was so vital, Grand Union may have been able to avoid liability under the doctrine of commercial impracti-

cability or frustration of purpose, even if a formal lease agreement had been signed. *See, e.g., Haas v. Pittsburgh Nat'l Bank,* 495 F.Supp.

## C.

■ Finally, the partners claimed that during the year and a half of negotiations with, and attempts to find a site for, Grand Union, a confidential relationship developed between the parties which was breached when Grand Union backed out of the deal. The partners maintain that the parties were engaged in a mutual endeavor with the shared goal of finding a site and constructing a shopping center for Grand Union's use. Georgia law defines confidential relations as follows:

> [W]hether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

Ga.Code Ann. § 23–2–58 (1982).

While we accept, as the partners contend, that a "confidential relationship may exist between businessmen," *Cochran v. Murrah*, 235 Ga. 304, 219 S.E.2d 421, 423 (1975), the facts of this case simply do not support any such finding. The parties fought over the terms of the lease agreement for approximately six months. This type of arms-length bargaining and the creation of a landlord-tenant relationship does not meet the requirements for finding a relationship of mutual confidence. Indeed, both parties had the same goal in this case, and they worked together to achieve it. But if that were the requirement for the formation of a confidential relationship, then most business transactions would qualify. Much more than a common goal is necessary to impose an obligation of good faith under section 23–2–58 of the Georgia Code.

815, 819 (W.D.Pa.1980) (frustration of purpose excuses nonperformance when supervening event substantially alters nature of agreement); *Ma v. Community Bank*, 494 F.Supp. 252, 257 (E.D.Wis.1980) (commercial frustration is caused by event nonoccurrence of which was

## III.

The district court appropriately concluded that the parties did not enter into an agreement to lease. To hold otherwise would ignore Grand Union's stated intention not to be bound until both parties executed a lease agreement. Similarly, summary judgment was properly granted on the partners' promissory estoppel claim. The partners' reliance on any alleged promises by Grand Union was unreasonable in light of their conditional nature. Finally, the parties did not enjoy a relationship of mutual confidence and thus Grand Union owed the partners no duty of good faith. Accordingly, the judgment of the district court is

AFFIRMED.

basic assumption of bargain); *In re Schenck Tours, Inc.*, 69 B.R. 906, 911 (Bankr.E.D.N.Y.) (frustration occurs when unforeseen event alters basis of bargain), *aff'd*, 75 B.R. 249 (E.D.N.Y.1987).