United States Court of Appeals,

Eleventh Circuit.

No. 96-8787.

Cherie JOHNSON, M.D., Plaintiff-Appellant,

v.

UNIVERSITY HEALTH SERVICES, INC. d.b.a. University Hospital;  Hossam E. Fadel, M.D.;
Hossam E. Fadel, M.D., P.C., Defendants-Appellees.

Dec. 3, 1998.

Appeal from the United States District Court for the Southern District of Georgia. (No. 94-00033
CV-1), Dudley H. Bowen, Jr., Judge.

Before TJOFLAT, BIRCH and MARCUS, Circuit Judges.

TJOFLAT, Circuit Judge:

The plaintiff in this case claims that a hospital's refusal to provide her with over $1 million

to start her own private practice constitutes a violation of the antitrust laws.  We disagree, and thus

affirm the judgment of the district court.

I.

Cherie Johnson, M.D., is a perinatologist, which is an obstetrician who specializes in

high-risk pregnancies.  She was recruited in May 1992 by Hossam E. Fadel, M.D. (a fellow

perinatologist), to work for his obstetrics/perinatology practice in Augusta, Georgia.  Dr. Fadel is

a member of the obstetrics department of University Hospital in Augusta, which is run by the

non-profit University Health Services (UHS).

Only a few months into her employment, Dr. Johnson became dissatisfied with her position.

Her primary dissatisfaction was based on the low number of new patients that Dr. Fadel allowed her

to admit to University Hospital.  According to Dr. Johnson, it was important that she admit a large

number of new patients in order to become a board certified perinatologist; Dr. Fadel was not permitting her to admit patients in sufficient numbers to allow her to qualify for certification as quickly as she would have liked. This violated Dr. Fadel's oral promise, made prior to the commencement of her employment, that he would allow Dr. Johnson to admit *all* of the practice's new patients.[1] Dr. Johnson also had concerns regarding the quality of care provided by Dr. Fadel to his patients.

In response to these problems, Dr. Johnson considered opening her own perinatology practice in Augusta. She spoke with Clyburn Davis, a physician recruiter at UHS, and Lou Imbrogno, UHS' Vice President of Physician Services, about the possibility of receiving financial assistance from UHS in setting up her own practice. These individuals led her to believe that UHS would provide her with financial support to open her own practice should she be unable to work out her differences with Dr. Fadel. Specifically, by April 1993, Dr. Johnson claims to have been promised an $800,000 line of credit, an income guarantee of $200,000 for her first year of practice,[2] an income guarantee of $250,000 for her second year of practice, loan forgiveness if she practiced in Augusta for two years and agreed to treat Medicare and Medicaid patients, office space, staff, and medical equipment. UHS, however, insisted that Dr. Johnson inform Dr. Fadel that she was considering other alternatives before it would provide any assistance.

---

[1]There is some debate over when (and whether) this promise was made. Dr. Johnson says it was made sometime prior to the start of her employment, but cannot remember whether it was made prior to her signing the employment contract. Dr. Johnson's husband, Dr. David Johnson, states in his deposition that the promise was made prior to Dr. Johnson's signing of the employment contract. Meanwhile, Dr. Fadel denies ever making such a promise.

[2]In other words, if Dr. Johnson grossed less than this amount, UHS would make up the difference.

2

Dr. Johnson's subsequent discussions with Dr. Fadel proved unhelpful; in response, UHS organized a meeting of the obstetrics department to discuss the situation. At the meeting, Drs. Johnson and Fadel both made oral presentations. The department then discussed the matter privately, and voted against subsidizing the establishment of a separate practice for Dr. Johnson.[3] Later that day, Dr. Fadel terminated Dr. Johnson's employment with his practice. She subsequently joined a perinatology practice in Spokane, Washington.

Dr. Johnson then sued Dr. Fadel and UHS in the United States District Court for the Southern District of Georgia.[4] She brought five claims. First, Dr. Johnson claimed that Dr. Fadel and UHS conspired to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1994), by preventing her from starting her own practice in competition with Dr. Fadel. Second, Dr. Johnson claimed that Dr. Fadel violated section 2 of the Sherman Act, 15 U.S.C. § 2 (1994), by monopolizing the practice of perinatology in the Augusta market. Third, Dr. Johnson claimed that UHS breached its contractual agreement to provide her with a financial assistance package to start her own perinatology practice. Fourth, as an alternative claim to breach of contract, Dr. Johnson claimed that UHS was estopped from refusing to provide her with financial assistance under the doctrine of promissory estoppel. Fifth, Dr. Johnson claimed that Dr. Fadel fraudulently induced her to come to Augusta and work for him by giving her the false promise that he would allow her to admit all of the practice's new patients.

_____

[3]The final decision was in the hands of UHS, which followed the recommendation of the obstetrics department.

[4]Dr. Johnson also named as a defendant Hossam E. Fadel, M.D., P.C., the professional corporation through which Dr. Fadel operates his practice. For purposes of this opinion, there is no significant distinction between Dr. Fadel in his individual capacity and Dr. Fadel in his corporate capacity; we therefore refer to both defendants simply as "Dr. Fadel."

3

The district court granted summary judgment for the defendants on all counts.[5] Dr. Johnson appeals.

## II.

In this part, we address each of Dr. Johnson's claims. We conclude that they are without merit, and thus affirm the judgment of the district court.

## A.

Dr. Johnson's first two causes of action are antitrust claims. We hold that she lacks standing to bring these claims.

Any cause of action, whether created by statute or common law, is designed to protect a certain class of people from certain types of injury. For instance, "breach of contract" is designed to protect parties to a contract (the class) from noncompliance with the terms of their contract (the type of injury). If A violates his supply contract with B, C cannot sue A for breach of contract because C is not a party to the contract, and thus not among the class of people protected by breach of contract. Likewise, if A assaults B, B cannot then sue A for breach of contract, because B's injury does not arise from noncompliance with the contract and thus B has not suffered the type of injury against which breach of contract protects. These two facets of a cause of action—class of plaintiff and type of injury—are the basis for the requirement that a plaintiff have "standing."

In antitrust law, the type of injury against which the law protects is unhelpfully called "antitrust injury." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct.

---

[5]Because this case comes to us on appeal from a grant of summary judgment for defendants, (1) all facts are viewed, and all factual disputes are resolved, in the light most favorable to the plaintiff; and (2) we are to affirm if there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.,* 133 F.3d 1405, 1409 (11th Cir.1998).

690, 697, 50 L.Ed.2d 701 (1977). What constitutes an antitrust injury is of course determined by the intent of the antitrust laws—in this case, the Sherman Act. *See Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1449 (11th Cir.1991). The Sherman Act, which the Supreme Court has called "the Magna Carta of free enterprise," was intended to protect "the economic freedom of participants in the relevant market." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538 & n. 38, 103 S.Ct. 897, 908 & n. 38, 74 L.Ed.2d 723 (1983) (quoting *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972)). Thus, antitrust injuries include only those injuries that result from interference with the freedom to compete.

In this case, absolutely no one interfered with Dr. Johnson's freedom to compete in the Augusta market as an obstetrician/perinatologist. On the contrary, even after deciding to deny Dr. Johnson her requested funding, UHS allowed Dr. Johnson to retain her privileges at University Hospital, offered to help her obtain a commercial loan and office space, and encouraged her to stay in Augusta. Neither UHS not Dr. Fadel did anything to impede Dr. Johnson's access to the necessary resources to start her own practice—she had full access to the capital markets, the labor market, land for office space, necessary supplies, and so forth.[6] Dr. Johnson could have even taken any patients that were willing to follow her away from Dr. Fadel's practice, because her employment

---

[6]This fact distinguishes our case from those on which Dr. Johnson relies, cases in which the defendant prevented the plaintiff from obtaining a necessary factor of production. *See Eastman Kodak Co. v. Image Tech. Serv., Inc.,* 504 U.S. 451, 455, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992) (defendant limited availability of necessary replacement parts); *General Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 799 (8th Cir.1987) (defendant imposed harsh credit and supply restrictions); *Multiflex v. Samuel Moore & Co.,* 709 F.2d 980, 987-88 (5th Cir.1983), *disavowed on other grounds by Deauville Corp. v. Federated Dept. Stores,* 756 F.2d 1183 (5th Cir.1985) (defendant impeded plaintiff's access to capital and customers).

contract did not contain a covenant not to compete. In sum, the evidence demonstrates that Dr. Johnson had every opportunity to enter and be fully competitive in the Augusta obstetrics/perinatology market; she simply chose not to do so.

The only "injury" that Dr. Johnson alleges is that UHS failed to confer an extraordinary benefit upon her.[7] UHS is a private, non-profit organization that generally is free to spend its money however it chooses, consistent with its non-profit purposes. Its decision not to subsidize Dr. Johnson's proposed practice is not the type of injury that the antitrust laws were intended to prevent. We therefore affirm the district court's grant of summary judgment on Dr. Johnson's antitrust claims.

B.

Dr. Johnson claims that her discussions with UHS officials regarding financial assistance were sufficient to create a contract, and that UHS breached that contract by ultimately deciding not to provide her with any such assistance. We hold that this claim is barred by the statute of frauds.

Georgia's statute of frauds provides, *inter alia,* that an "agreement that is not to be performed within one year from the making thereof" must be in writing. *See* Ga.Code Ann. § 13-5-30(5) (1982). Dr. Johnson concedes that the purported contract is not in writing; the question thus becomes whether the alleged contract was to be performed more than one year from its making. According to Dr. Johnson, UHS promised her the following: an $800,000 line of credit, an income guarantee of $200,000 for her first year of practice, an income guarantee of $250,000 for her second

---

[7]Dr. Johnson alleges that financial assistance from UHS is not extraordinary, but common. Although UHS does appear to have provided financial assistance to a number of physicians in the past, such financial assistance does not appear to be common in the amounts that Dr. Johnson seeks. Furthermore, Dr. Johnson has presented no evidence that a substantial number of physicians in Augusta needed hospital subsidization to allow them to enter the market, and thus that she has suffered any special injury as a result of UHS' actions.

6

year of practice, loan forgiveness if she practiced in Augusta for two years and agreed to treat Medicare and Medicaid patients, office space, staff, and medical equipment. Dr. Johnson does not state exactly what she was required to do in exchange for this package of benefits (with the exception of the conditions on loan forgiveness), but presumably she was expected to open a perinatology practice in Augusta.

Certain of UHS' promises clearly could not have been performed within one year from the making of the contract—namely, the income guarantee for her second year of practice and the loan forgiveness after two years. Furthermore, Dr. Johnson testified that two other promises by UHS—the provision of office space and the line of credit—had a duration of two years. If these promises are not severable from the rest of the contract, then the entire contract is invalid under the statute of frauds. Whether one portion of a contract is severable from others depends on the intent of the parties. *See* Ga.Code Ann. § 13-1-8(b) (1982). In this case, Dr. Johnson has repeatedly and consistently treated UHS' promises as a single two-year promise of financial assistance, thus suggesting that she viewed the contract as a non-severable two-year agreement.[8] In addition, the provisions that are directly barred by the statute of frauds make up the majority of the value of the contract; severing these provisions would leave a contract much different from the one originally contemplated. We therefore conclude that the entire contract (if one existed) was intended to run for two years, and thus was required by the statute of frauds to be in writing.

Dr. Johnson contends that her partial performance of the contract prevents application of the statute of frauds. Partial performance of a contract by the party seeking to enforce it can remove

---

[8]UHS' understanding of the contract is difficult to discern, because it denies ever having made any contract with Dr. Johnson.

the contract from the statute of frauds. *See* Ga.Code Ann. § 13-5-31(3) (1982). Dr. Johnson claims that she partially performed the contract by speaking with Dr. Fadel, at UHS' request, about the possibility of leaving to start her own practice. We hold that this cannot constitute partial performance of the contract. The alleged contract required Dr. Johnson, in exchange for financial assistance, to start and maintain a perinatology practice in Augusta. Thus, to have partially performed that contract, Dr. Johnson would have needed to take steps toward opening a practice—e.g., hiring staff, opening an office, seeing patients, and advertising. Speaking with Dr. Fadel was not part of the contract. Rather, such a conversation was a condition precedent to the contract—UHS insisted that Dr. Johnson try to work out her differences with Dr. Fadel before it would contract with her to start her own practice. Performance of a condition precedent does not constitute partial performance of a contract sufficient to make the statute of frauds inapplicable. *See Vitner v. Funk,* 182 Ga.App. 39, 354 S.E.2d 666, 670 (Ga.Ct.App.1987) (stating that "acts which are merely preparatory or preliminary to the performance of a contract" do not constitute partial performance); *Utica Tool Co. v. Mitchell,* 135 Ga.App. 635, 218 S.E.2d 650, 652 (1975) (same).

Furthermore, even if a talk with Dr. Fadel could be seen as part of the contractual agreement, it would be too insubstantial to constitute part performance. The part performance required by the relevant exception to the statute of frauds must be "substantial and essential to the contract." *Ikemiya v. Shibamoto Am., Inc.,* 213 Ga.App. 271, 444 S.E.2d 351, 352 (Ga.Ct.App.1994). In this case, Dr. Johnson's primary responsibility under the contract was to start a perinatology practice. Speaking with Dr. Fadel was only tangentially related to that responsibility. Her performance was thus an insubstantial part of the agreement, and therefore was insufficient to make the statute of frauds inapplicable.

8

Because the alleged contract was not in writing as required by the statute of frauds, and because no exception to the statute of frauds is applicable, we hold that the contract is unenforceable and Dr. Johnson therefore cannot sue for its breach.

C.

As an alternative to the breach of contract claim, Dr. Johnson argues that UHS should be prevented from refusing to provide her with the promised financial assistance under the doctrine of promissory estoppel.[9] We hold that Dr. Johnson has failed to present evidence of reasonable reliance, and thus her promissory estoppel claim fails.

The district court granted summary judgment on this claim on the ground that it was barred by the statute of frauds. Georgia law is unclear regarding whether the statute of frauds can defeat a claim of promissory estoppel. *See* Eric Mills Holmes, *Restatement of Promissory Estoppel,* 32 Willamette L.Rev. 263, 367-69 (1996) (attempting to summarize Georgia law on promissory estoppel and expressing confusion over whether Georgia recognizes the doctrine as a defense to a statute of frauds argument). *Compare Presto v. Scientific-Atlanta, Inc.,* 193 Ga.App. 606, 388 S.E.2d 719, 720 (Ga.Ct.App.1989) (holding that unenforceable promises cannot form the basis for a claim of promissory estoppel), *and Godwin v. City of Bainbridge,* 172 Ga.App. 290, 322 S.E.2d 733, 735 (1984) (same), *with Augusta Surgical Ctr., Inc. v. Walton & Heard Office Venture,* No. A98A1599, --- Ga.App. ----, --- S.E.2d ---- (Ga.Ct.App. Oct. 20, 1998) (holding that the absence of a binding agreement does not defeat a promissory estoppel claim), *and Kamat v. Allatoona Fed. Sav.*

---

[9]Georgia law defines the doctrine of promissory estoppel as follows: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Ga.Code Ann. 13-3-44(a) (1998).

*Bank,* 231 Ga.App. 259, 498 S.E.2d 152, 155 (1998) (same). The one supreme court case discussing the issue, however, clearly holds that promissory estoppel allows enforcement of promises that would otherwise be defeated by the statute of frauds. *See 20/20 Vision Ctr., Inc. v. Hudgens,* 256 Ga. 129, 345 S.E.2d 330, 335 n. 7 (1986). Furthermore, promissory estoppel is an equitable doctrine, and as such is intended to counteract the occasional harshness of common law rules—such as the statute of frauds. *See Simpson Consulting, Inc. v. Barclays Bank PLC,* 227 Ga.App. 648, 490 S.E.2d 184, 193 (1997) (noting that promissory estoppel is an equitable doctrine); *Black's Law Dictionary* 540 (6th ed.1990) (defining equity as "[j]ustice administered according to fairness as contrasted with the strictly formulated rules of common law"). It would therefore defeat the purpose of promissory estoppel to confine it to promises that conform to the statute of frauds. *See Doll v. Grand Union Co.,* 925 F.2d 1363, 1372 (11th Cir.1991) (noting that "the doctrine of promissory estoppel ... was designed specifically to address cases where the plaintiff has no legally enforceable rights but has suffered a loss due to reliance on the defendant's promises").

Promises that do not conform to the statute of frauds, however, will often be equally unenforceable under a promissory estoppel theory. Promissory estoppel requires that reliance on the promise be reasonable. *See Simpson Consulting,* 490 S.E.2d at 193. It usually is unreasonable to rely on a substantial promise that has not been reduced to writing. *See R.T. Patterson Funeral Home, Inc. v. Head,* 215 Ga.App. 578, 451 S.E.2d 812, 817 (Ga.Ct.App.1994) (noting the "general rule that there is no justifiable reliance upon future promises which must be in writing to be enforceable"). Such is the case here. Dr. Johnson claims that UHS offered her a complex, multi-faceted aid package worth over $1 million. She bases this claim solely on a series of telephone conversations with low-ranking UHS officials. Furthermore, these conversations were

10

at best discussions of individual contractual terms; in none of the conversations was there a verbal exchange that even loosely resembled the making of a full contract. In light of the size of the aid package, the limited authority of the persons with whom Dr. Johnson was speaking, and the somewhat ambiguous nature of their conversations, it would have been patently unreasonable for Dr. Johnson to act in reliance on the series of oral representations that she claims constituted a promise of financial assistance. Her promissory estoppel claim therefore fails.

### D.

Dr. Johnson's final claim is fraudulent inducement. Specifically, she claims that Dr. Fadel fraudulently induced her to move to Augusta and join his practice by promising her that she would be permitted to admit all of the practice's new patients, thus allowing her quickly to become a board certified perinatologist.

Under Georgia law, the elements of fraud are as follows: (1) a misrepresentation by the defendant, (2) intent to deceive, (3) intent to induce the plaintiff to act or refrain from acting, (4) justifiable reliance on the misrepresentation, and (5) damage. *See Smalls v. Blueprint Dev., Inc.,* 230 Ga.App. 556, 497 S.E.2d 54, 57 (Ga.Ct.App.1998). In this case, Dr. Johnson has failed to produce evidence of justifiable reliance. Dr. Johnson worked for Dr. Fadel pursuant to a detailed, twelve-page, custom-made contract. If the supply of new patients was as important to Dr. Johnson as she argues in this action, there was no reason for her not to include a provision relating to this

11

matter in the contract.[10]  Under these circumstances, Dr. Johnson was unjustified in relying on Dr. Fadel's alleged promise.

III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.[11]

---

[10]As noted previously, *see supra* note 1, there is some debate over whether the promise was made before or after the employment contract was signed.  If the promise was made afterwards, Dr. Johnson obviously could not have been expected to include it in the contract.  Just as obviously, however, if the promise was made after the contract was signed, Dr. Johnson could not have acted in reliance on the promise when she signed the contract.  Thus, she still would not have a valid fraud claim.

[11]Dr. Johnson also challenges the district court's ruling granting UHS' motion to strike certain evidence as hearsay.  None of our holdings in this opinion are contingent on this evidence;  we therefore reject this challenge as moot.