A01A0787, A01A0893. CENTRE POINTE INVESTMENTS, INC.
v. FRANK M. DARBY COMPANY (two cases).

(549 SE2d 435)

PHIPPS, Judge.

The Frank M. Darby Company sued Centre Pointe Investments, Inc. to recover a brokerage commission it allegedly had earned in negotiating a lease between Centre Pointe and a nonparty, ICTS. A jury found that the Darby Company was the procuring cause of the lease and awarded it damages under a theory of quantum meruit. The jury also found that the Darby Company was entitled to attorney fees and litigation expenses, which the trial court later awarded.

In Case No. A01A0787, Centre Pointe appeals the damages award, arguing that the Darby Company was not the procuring cause of the lease, that the Darby Company failed to prove quantum meruit damages, and that the trial court improperly admitted evidence of settlement negotiations. In Case No. A01A0893, Centre Pointe appeals the award of attorney fees, arguing that there was no evidence it acted in bad faith. For reasons that follow, we affirm in both cases.

At trial, real estate broker Kevin Darby testified that on December 12, 1997, he received a call from F. B. Ayazi, who represented a company called ICTS that was seeking commercial office space in Atlanta. Darby compiled listings of various properties, including a building owned by Centre Pointe, and showed them to Ayazi on December 16. Ayazi expressed interest in the Centre Pointe property. He asked Darby to find out if Centre Pointe could meet several unique requirements of ICTS and to solicit a lease proposal. Darby did so.

On December 17, Rodney Scogin of Centre Pointe faxed Darby a "proposal that attempts to accommodate your client." Darby relayed the proposal to Ayazi and took him to see the property. Based on additional requests from Ayazi, Darby faxed a counterproposal to Scogin.

On December 19, Scogin faxed Darby a revised proposal incorporating the additional requests. Again, Darby relayed the proposal to Ayazi, with information about another building in which Ayazi had expressed interest. Ayazi told Darby that he was considering both the Centre Pointe building and another property and wanted to consider his options over the holidays.

Also on December 19, Darby faxed Scogin a copy of the Darby Company's standard commission agreement, which calls for payment by the landlord of the first month's rent plus four percent of the remaining lease payments. According to Darby, this "first and four" arrangement is the standard broker commission in metro Atlanta for commercial office leases. Scogin did not respond to Darby's fax of the

commission agreement, which Darby interpreted to mean that "there was no problem" with it.

In early January 1998, Darby called Ayazi "to restart negotiations and find out if [ICTS was] ready to move forward" on the Centre Pointe property. Ayazi told Darby to contact Scogin and continue the negotiations. Darby called Scogin, who said that he had received a letter from Ayazi stating that the Darby Company was no longer representing ICTS in the transaction. Darby repeatedly tried to contact Ayazi, who would not return his phone calls. According to Darby, Ayazi never told him that ICTS was terminating the Darby Company's services.

Darby asked Scogin to fax him a copy of the letter from Ayazi to Centre Pointe. The letter stated that ICTS wanted to negotiate directly with Centre Pointe, and it contained several counterproposals to Centre Pointe's revised lease proposal. Darby did not receive a copy of the letter, which was dated January 2, 1998, until after this litigation began.

Darby testified that he had asked Scogin if the Darby Company "would be protected on the deal and still paid our . . . full commission," and that Scogin had said, "don't worry about it . . . you're fine, you're protected. . . . It just seems Mr. Ayazi wants to negotiate some final detail points." According to Darby, it was not unusual for a tenant to negotiate final details of a lease agreement directly with the landlord, and in such cases the broker still would receive its commission. Darby wrote Scogin a letter on January 5, 1998, confirming that pursuant to their conversation, the Darby Company would receive a full commission in the event a lease was signed and would put forth its best efforts to consummate a deal. Centre Pointe did not respond to the letter.

Darby testified that he contacted Scogin several times regarding the status of the deal and Scogin never indicated an intention not to pay the Darby Company's commission. Eventually, on January 9, Scogin told Darby that ICTS and Centre Pointe had signed a lease. According to Darby, Scogin reiterated that Centre Pointe would pay the broker commission and offered to send Darby copies of the pertinent pages of the lease so that the Darby Company could calculate the commission. Those pages were sent on January 15. That same day, the Darby Company sent Centre Pointe an invoice for $50,818.08 for its commission.

Centre Pointe did not pay the invoice. Darby called Scogin, who, he claimed, "made a variety of excuses" for the nonpayment, including ICTS's tenuous financial situation and questions regarding the validity of the lease. In mid-February 1998, Scogin offered to pay the Darby Company five percent of the lease payments, but Darby refused to accept that amount.

In April 1998, the Darby Company sued Centre Pointe to recover the commission as billed, alleging theories of breach of contract, procuring cause, and quantum meruit. At trial, the jury rejected the contract claim, but found that the Darby Company was the procuring cause of the lease and was entitled to quantum meruit damages in the amount of $50,818.08.[1] The jury also concluded that the Darby Company was entitled to attorney fees. After an evidentiary hearing, the court awarded attorney fees in the amount of $37,342.

### Case No. A01A0787

1. To recover a commission under a quantum meruit theory, the Darby Company must show that (1) it performed services valuable to Centre Pointe; (2) Centre Pointe knowingly accepted those services; (3) it would be unjust for Centre Pointe to accept the services without compensating the Darby Company; (4) the Darby Company expected compensation when it rendered the services; and (5) the Darby Company was the procuring cause of the lease.[2] To prove that it was the "procuring cause" of a lease, a broker ordinarily must show that "there were negotiations still pending between the broker and the prospective [tenant] and that the owner was aware that negotiations were still pending at the time he consummated the [lease]."[3] However,

> where the owner knowingly interferes with the negotiations between the [tenant] and the broker, it becomes unnecessary to show negotiations were pending when the [lease] was consummated. [Cits.] The broker can thus make out a prima facie case by showing "that negotiations for the [lease] were set on foot through his efforts, that he performed every service required by his employment which it was possible to perform, and that the failure on his part to personally consummate the trade was due to the interference of the defendant."[4]

Centre Pointe contends that the Darby Company was not the procuring cause of the lease and that it did not knowingly accept the Darby Company's services. The Darby Company's theory at trial was

---

[1] The jury's verdict initially included interest, but the court excluded that portion of the award.

[2] *Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 596 (11) (533 SE2d 136) (2000).

[3] (Punctuation omitted.) *Kraft Land Svcs. v. Hart Co.*, 165 Ga. App. 358, 363 (1) (300 SE2d 186) (1983); see also *Pittard Machinery Co. v. Mitsubishi Intl. Corp.*, 192 Ga. App. 270, 271 (2) (384 SE2d 423) (1989).

[4] *Kraft Land*, supra.

that Centre Pointe and ICTS colluded to exclude the Darby Company from the deal before the lease was consummated. Centre Pointe claims there was no evidence it interfered with any negotiations between the Darby Company and ICTS. Centre Pointe points to Darby's testimony that he had "no clue" why ICTS terminated the Darby Company's brokerage services.

We affirm the jury's verdict if there is any evidence to support it.[5] Taken in the light most favorable to the Darby Company, the evidence showed that the timing and circumstances of ICTS's termination of the Darby Company's services were suspicious. ICTS and Centre Pointe signed a lease just seven days after the termination. Darby learned of the termination not from Ayazi, who had told him to continue negotiations with Centre Pointe, but from Scogin. Scogin promised to fax Darby a copy of the termination letter, but did not do so. Despite repeated efforts, Darby was not able to reach Ayazi to confirm the termination. In addition, Scogin testified that he had "serious concerns" about the deal because ICTS was financially troubled and would need an initial period of free rent. This evidence was sufficient to permit the jury to infer that Centre Pointe interfered with the Darby Company's brokerage relationship because it did not want to pay the commission.[6] Although Scogin denied any collusion and professed surprise at the termination, the jury was not required to believe him, particularly as his testimony was inconsistent on multiple points.[7]

Centre Pointe also argues that the Darby Company was merely an "undisclosed agen[t] after-the-fact" that "conceal[ed] its intention to seek payment from Centre Pointe," in violation of statutory and regulatory requirements that brokers timely disclose the existence of a brokerage relationship to all parties involved in the transaction.[8] However, Scogin testified that he knew while the negotiations were taking place that the Darby Company was representing ICTS, and he acknowledged receiving a copy of the Darby Company's standard commission agreement within days of the beginning of negotiations. Moreover, Darby testified that Scogin assured him on multiple occa-

---

[5] *Horan v. Pirkle*, 197 Ga. App. 151, 153 (2) (397 SE2d 734) (1990); *Clark v. United Ins. Co.*, 199 Ga. App. 1, 3 (1) (404 SE2d 149) (1991).

[6] See *Perimeter Realty*, supra at 597 (whether broker was "procuring cause" of sale was jury question where there was evidence that buyer and seller decided to negotiate sale without presence of broker after broker brought them together).

[7] For example, Scogin first testified at one point that he receives faxed copies of brokerage commission agreements "all the time," but later stated that he has "never had one come across a fax machine." In addition, Scogin gave three inconsistent explanations for the lease agreement's failure to list the Darby Company as a broker for ICTS. See *Rubin v. Fields*, 237 Ga. App. 207, 209 (1) (515 SE2d 180) (1999) (jury was free to reject testimony of witness who made self-contradictory statements).

[8] See OCGA § 10-6A-4 (b).

sions before the lease was signed that Centre Pointe would pay the Darby Company's commission. Thus, there is evidence that Centre Pointe accepted the Darby Company's services with full knowledge that the Darby Company expected payment.

2. Centre Pointe claims that the Darby Company failed to prove quantum meruit damages because it submitted no evidence of the time it spent on the transaction or its hourly rate for services.

The measure of recovery in quantum meruit is the reasonable value of the services rendered to the party who received them.[9] "Value, as any other matter to be proved, may be shown circumstantially or inferentially as well as directly or positively."[10] Determining the reasonable value of the services is the task of the jury, whose finding will not be disturbed if there is any evidence to support it.[11]

Here, the Darby Company sought quantum meruit damages in an amount equal to the commission calculated according to the standard agreement it sent to Centre Pointe. This was prima facie proof of the value of the Darby Company's services, even though the jury rejected the Darby Company's contract claim.[12] The Darby Company also presented evidence that this amount was the standard "first and four" broker commission for commercial real estate leases in the area. Scogin admitted that Centre Pointe had paid "first and four" commissions to brokers on "numerous occasions." Moreover, there was evidence that Centre Pointe would collect more than $800,000 in rent from ICTS over the life of the lease and that ICTS was current on all payments as of the date of trial. This evidence was sufficient to support the jury's damages award.

3. Before trial, Centre Pointe moved in limine to block the introduction of evidence of Scogin's offer to pay the Darby Company five percent of the ICTS lease. Rejecting Centre Pointe's claim that the offer was an inadmissible settlement negotiation, the trial court allowed the evidence. We find no abuse of discretion.

The case of *Campbell v. Mut. Svc. Corp.*,[13] a suit by a real estate broker to recover a commission from a seller, is controlling. There, the broker testified that he called the seller after the sale asking for his commission and the seller offered to pay him $5,000. We held: "the plaintiff in the present case simply made a demand under the terms of his contract and there was a counter-offer which was not in the nature of a proposition made with a view to compromise. The tes-

---

[9] See OCGA § 9-2-7; *Atlanta Limousine Svc. v. Nichols*, 155 Ga. App. 742 (272 SE2d 584) (1980).

[10] (Citations and punctuation omitted.) *Futch v. Guthrie*, 176 Ga. App. 672, 673-674 (2) (337 SE2d 384) (1985).

[11] *Atlanta Limousine Svc.*, supra at 742-743.

[12] See *G. Carbonara & Co. v. Helms*, 205 Ga. App. 547, 548 (423 SE2d 36) (1992).

[13] 152 Ga. App. 493 (263 SE2d 202) (1979).

timony does not indicate any effort of the parties to reach a settlement. [Cit.]"[14]

Here, as in *Campbell*, Darby called Scogin and demanded payment in accordance with the commission agreement. Scogin made a counteroffer. Nothing in the record shows that this counteroffer was made with a view to compromise.[15]

## Case No. A01A0893

4. Centre Pointe contends that the award of attorney fees to the Darby Company was unjustified because there was no evidence that Centre Pointe acted in bad faith and there was a bona fide controversy between the parties.

OCGA § 13-6-11 permits the recovery of attorney fees when the defendant has acted in bad faith. Bad faith may be found when the defendant acts with "some interested or sinister motive," but cannot be based on a mere refusal to pay a just debt.[16] Whether the plaintiff is entitled to attorney fees is a question for the jury, whose determination will be affirmed if there is any evidence to support it.[17]

As discussed in Division 1, there was evidence suggesting that Centre Pointe and ICTS deliberately excluded the Darby Company from the deal on the eve of its consummation to avoid paying the commission. In addition, contrary to Centre Pointe's contention that the Darby Company never demanded a commission until after the lease was signed, there was evidence that Scogin knew that the Darby Company was acting as a broker for ICTS and expected a commission and that he repeatedly misrepresented to Darby that the Darby Company "would be protected" on the deal. Although the evidence of Centre Pointe's sinister motive was largely circumstantial, we cannot say it was insufficient as a matter of law.[18]

As for Centre Pointe's argument that there was a bona fide controversy, that issue is relevant only when a plaintiff seeks attorney fees because the defendant was stubbornly litigious or caused the plaintiff unnecessary trouble or expense. It does not apply when the plaintiff alleges bad faith by the defendant.[19]

*Judgments affirmed. Smith, P. J., and Barnes, J., concur.*

---

[14] Id. at 494 (2).

[15] See also *Turner Broadcasting System v. Europe Craft Imports*, 186 Ga. App. 286, 289 (3) (367 SE2d 99) (1988); *Williams v. Smith*, 71 Ga. App. 632, 642-643 (9) (31 SE2d 873) (1944).

[16] (Punctuation omitted.) *M & H Constr. Co. v. North Fulton Dev. Corp.*, 238 Ga. App. 713, 715 (1) (519 SE2d 287) (1999).

[17] *Sass v. First Nat. Bank of Cherokee*, 228 Ga. App. 7 (491 SE2d 76) (1997).

[18] See *Southern Co. v. Hamburg*, 220 Ga. App. 834, 841 (4) (470 SE2d 467) (1996) (finding of bad faith may be based on circumstantial evidence).

[19] See *Sass*, supra at 7 (1).

DECIDED MAY 14, 2001 —
RECONSIDERATION DENIED JUNE 1, 2001 —

*James L. Bass, Arthur F. Millard,* for appellant.
*Allen W. Groves, Steven M. Staes,* for appellee.