[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 11-11618 & 11-11650
_____

D. C. Docket No. 1:09-cv-003110-CAP

HEMISPHERX BIOPHARMA, INC., a Delaware corporation,

> Plaintiff - Counter-Defendant - Appellee - Cross-Appellant,

versus

MID-SOUTH CAPITAL, INC., a South Carolina Corporation,

> Defendant - Counter Claimant - Appellant - Cross-Appellee,

ADAM CABIBI, ROBERT ROSENSTEIN, Individually,

> Defendants - Cross-Appellees,

THE SAGE GROUP, INC.,

> Counter Defendant - Cross-Appellee.

—————————————————

Appeals from the United States District Court
for the Northern District of Georgia

—————————————————
(August 14, 2012)

Before MARTIN, HILL and EBEL,[*] Circuit Judges.

EBEL, Circuit Judge:

During an eight-month period, Plaintiff and Counterclaim-Defendant

Hemispherx Biopharma, Inc. ("Hemispherx") hired three different investment

brokers to raise capital for it.  Hemispherx hired the first two brokers at a time

when it was difficult to sell Hemispherx's stock.  Months later, when market

forces made Hemispherx's stock much more attractive, Hemispherx hired a third

broker, a heavy hitter in the industry, which was able very quickly to raise $31

million in capital for Hemispherx through stock sales.

All three brokers focused their capital-raising efforts on several of the same

prospective investors and, when several of those investors eventually purchased

Hemispherx stock, a dispute predictably arose as to which of the three brokers was

entitled to a commission on the stock sales.  In this diversity action, governed by

Georgia law, the first investment broker Hemispherx hired, Defendant and

———————————————

[*] Honorable David M. Ebel, United States Circuit Judge for the United States Court of
Appeals for the Tenth Circuit, sitting by designation.

2

Counterclaimant Mid-South Capital, Inc. ("Mid-South"), seeks to recover a commission for its efforts in identifying those investors and introducing them to Hemispherx. Hemispherx contends, instead, that Mid-South and its employees, Defendants Robert Rosenstein and Adam Cabibi, tortiously interfered with Hemispherx's business relationship with its investors and with the third investment broker who ultimately closed the stock deals at issue here. The district court denied each party relief, granting judgment on the pleadings to Hemispherx on Mid-South's breach-of-contract claim, and summary judgment to Hemispherx on Mid-South's remaining claims and to Mid-South on Hemispherx's intentional interference with business relationships claim. Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's decision in part, REVERSE in part, and REMAND this case to the district court for further proceedings.

## I.  BACKGROUND

### A.  The business relationship between Mid-South and Hemispherx

Hemispherx is a publicly-traded company researching and developing treatments for viral diseases and cancers. In August 2008, Hemispherx needed to raise between $4 and $6 million in capital. To that end, Hemispherx's chief executive officer ("CEO"), William Carter, M.D., met with Robert Rosenstein, who had previously succeeded in raising capital for Hemispherx. Rosenstein

3

worked for Mid-South.

During their discussions, Carter and Rosenstein strategized that, because Hemispherx's stock was not trading well at that time, Hemispherx would probably have to raise capital through a loan arrangement, secured by all of Hemispherx's assets except its intellectual property and repayable in either cash or Hemispherx stock, at the lender's option—a secured convertible debenture. In order to pitch such an investment opportunity to prospective investors, Rosenstein asked Carter to send him information about Hemispherx and particularly about its assets. Before sending Mid-South this information, however, Hemispherx asked for a copy of Mid-South's Engagement Letter. Rosenstein sent Hemispherx Mid-South's standard Engagement Letter in September 2008.

As the parties had previously discussed, the Engagement Letter discounted Mid-South's usual brokerage fee because Hemispherx was a previous customer of Rosenstein. Therefore, the Engagement Letter stated that Hemispherx would pay Mid-South cash in an amount equal to 5% of the capital raised from investors that Mid-South identified or introduced to Hemispherx. Further, Hemispherx would give Mid-South stock warrants—the right to buy Hemispherx stock at a set price exercisable, in this case, within five years of issuance—in an amount equal to 5% of the stock issued as part of the capital-raising transaction. The Engagement

4

Letter additionally provided that Mid-South would act as Hemispherx's broker on a non-exclusive basis and that either party could terminate the agreement with thirty days' written notice to the other party.  But even after the agreement terminated, Hemispherx would be obligated to pay Mid-South a commission for at least another two years on any transactions involving investors Mid-South had identified or introduced to Hemispherx during the term of the agreement.  These terms were similar to engagement agreements used by other investment brokers.

Although Hemispherx had requested the Engagement Letter, no one ever signed the Letter on Hemispherx's behalf.  Once Hemispherx received the Mid-South Engagement Letter, however, in September 2008, Dr. Carter authorized Rosenstein to begin seeking investors for Hemispherx.  To facilitate Rosenstein's efforts,  Hemispherx sent him a list of its assets, as well as other information Rosenstein needed to pitch the opportunity to invest in Hemispherx to potential investors.  Rosenstein, aided by another Mid-South employee, Adam Cabibi, then contacted a number of potential investors and began putting together several proposed deals to present to Hemispherx.

The primary dispute in this litigation, discussed at length below, is the legal status of the business relationship between Hemispherx and Mid-South.  Briefly summarized here, the parties' positions regarding that relationship are these: Mid-

5

South contends that, even though no one at Hemispherx ever signed the Engagement Letter, Hemispherx, by its conduct, assented to the terms of that agreement, or at least led Mid-South to believe Hemispherx had agreed to the terms of the Engagement Letter. Hemispherx claims, instead, that it rejected the terms of the Engagement Letter by not signing the agreement, although Hemispherx apparently never voiced any disagreement to Mid-South. Hemispherx contends that the parties had an "ad hoc arrangement" by which Hemispherx agreed to pay Mid-South an unspecified commission, but only if Mid-South itself closed an investment deal.

## B. Mid-South pursues an investment deal involving Gemini Strategies LLC

To complicate matters further, on November 19, 2008, Dr. Carter sent Mid-South a letter indicating that Hemispherx would pay Mid-South "a fee from a financing which . . . is completed within the next 3 months" involving "any" of five investors listed in the letter. (Doc. 127-11 at 4.) One of the listed investors was Gemini Strategies LLC ("Gemini"). On November 25, 2008, Mid-South submitted to Hemispherx an investment proposal from Gemini indicating that it was willing to contribute $1 million dollars toward a $6.5 million loan-type arrangement with Hemispherx. Mid-South then proceeded to negotiate with another potential investor, Hudson Bay, to "fill out" Gemini's proposed

6

transaction.  (Docs. 119 ¶ 5; 125-12 ¶ 5; 127-12 ¶ 14.)  Mid-South, however, was ultimately not able to close this, or any other, deal with any of the investors Dr. Carter specified in his November 2008 letter.

## C.  Hemispherx hires a second investment broker, Cato Capital

Unbeknownst to Mid-South, on the same day that Dr. Carter sent his letter to Mid-South promising to pay Mid-South a fee for any "financing . . . completed within the next 3 months" involving any of five specified investors (Doc. 127-11 at 4),  Hemispherx also engaged a second investment broker, Cato Capital ("Cato"), to seek capital on Hemispherx's behalf.  Over the next few months, Cato and Mid-South sought capital on Hemispherx's behalf from some of the same potential investors.  In December 2008 and January 2009, Hemispherx, through its investment advisor, Counterclaim- Defendant The Sage Group ("Sage"), and Sage's executive director Wayne Pambianchi, told Mid-South that Hemispherx was "considering" retaining a second investment broker, and suggested ways to calculate the commission, should one of the potential investors that had been contacted by both brokers invest in Hemispherx.  (Docs. 127-13 ¶ 16; 134-1 ¶ 16.)  Neither Cato nor Mid-South agreed to Pambianchi's proposals, and the issue was dropped.  Each  broker continued its own efforts to raise capital for Hemispherx.

## D.  Mid-South pursues an investment deal with Hudson Bay

7

Although prospective investor Hudson Bay had initially proposed completing Gemini's proposed deal, in the spring of 2009 Hudson Bay suggested instead that it finance its own deal with Hemispherx. Before negotiations began on this proposal, Hemispherx's attorney drafted a confidentiality agreement which representatives of Hemispherx, Hudson Bay and Mid-South signed. Hemispherx also paid for Hudson Bay to obtain an appraisal of Hemispherx's assets. Then, over the next few months, Hemispherx and Hudson Bay, facilitated by Mid-South, continued negotiations for a loan-type transaction. These negotiations resulted in Hemispherx sending Hudson Bay a proposal on April 7, 2009. Hudson Bay countered with its own proposal on April 14, 2009, which Hemispherx found unacceptable.

## E.  Hemispherx's fortune turns

During the last week of April 2009, Hemispherx's fortunes turned for the better. An influenza outbreak caused heavy trading in Hemispherx's stock because Hemispherx had a potentially useful vaccine, increasing Hemispherx's stock price and making the stock much more attractive to investors. On April 27, 2009, Dr. Carter instructed Mid-South's Cabibi to inform Hudson Bay that Hemispherx wanted to start over with a new proposal from Hudson Bay, if Hudson Bay was still interested in investing in Hemispherx. The deal Dr. Carter proposed

8

involved Hudson Bay both making Hemispherx a $3 million loan and purchasing $1 million in Hemispherx's stock. Cabibi conveyed this offer to Hudson Bay.

At the same time, in late April, Mid-South solicited a term sheet from Tailwind, an investment consortium. Hemispherx authorized Mid-South to obtain a commitment from Tailwind to purchase $1 million in Hemispherx's stock. During Mid-South's negotiations with Tailwind, two other potential investors with which Mid-South had previously negotiated, Cranshire and Iroquois, stepped in and offered to buy $1 million of Hemispherx stock. Mid-South also conveyed Cranshire's and Iroquois's offers to Hemispherx.

## F. Hemispherx engages a third investment broker, Rodman and Renshaw

As the price of Hemispherx's stock continued to rise, a third investment broker, Rodman and Renshaw LLC ("Rodman"), approached Hemispherx, suggesting this would be an opportune time for Hemispherx to raise capital by selling its stock. Rodman, which was a heavy hitter in the realm of biotechnology investment, offered to broker these stock sales for Hemispherx.

Once Rodman approached Hemispherx about brokering the sale of Hemispherx stock, Dr. Carter, in early May, contacted Mid-South's Cabibi. The parties dispute the exact message Carter conveyed to Cabibi. Mid-South contends that Carter told Cabibi that Hemispherx was "temporarily suspend[ing]" Mid-

9

South's capital-raising activities and that Hemispherx was instead seeking a "strategic investor" who would provide funding resulting in a deal that would be "non-dilutive" to its current shareholders. (Docs. 124-3; 127-13 ¶ 25.) Mid-South understood that to mean that Hemispherx was negotiating a partnership with another pharmaceutical company which would not require Hemispherx to sell any of its stock to private investors. Hemispherx, on the other hand, asserts that Dr. Carter informed Cabibi that Mid-South was fired because it had been ineffectual in raising capital for Hemispherx, and thus Mid-South should no longer seek capital on Hemispherx's behalf or otherwise act as its agent. Regardless of the message conveyed, Mid-South, by no later than May 4, 2009, ceased its efforts to raise capital for Hemispherx.

Hudson Bay, nevertheless, contacted Mid-South on May 8, proposing to buy $5 million in Hemispherx stock. Mid-South immediately notified Hemispherx of this offer. Also on May 8, Iroquois contacted Mid-South, seeking to increase its proposed purchase of Hemispherx stock from $1 to $3 million. Mid-South passed this offer along to Hemispherx, too, that same day.

Unbeknownst to Mid-South, however, Hemispherx was negotiating to retain Rodman and, on Sunday, May 10, Hemispherx signed an engagement letter making Rodman its exclusive investment broker for thirty days. The next day,

10

May 11, Rodman closed a sale of Hemispherx stock to Hudson Bay and one other investor, each paying $7.5 million. Within the next week, Rodman closed another deal for the sale of Hemispherx stock to Cranshire and Iroquois. These stock purchases raised a total of $31 million in capital for Hemispherx.

## II.  SUMMARY OF THE PARTIES' CLAIMS AND THIS DECISION

Less than one month after Rodman brokered these stock deals, Hemispherx sued Mid-South and its employees, Rosenstein and Cabibi. Hemispherx alleged these defendants tortiously interfered with Hemispherx's business relationship with potential investors and with Rodman when, after Hemispherx had suspended Mid-South's capital-raising efforts, Mid-South nevertheless passed along to Hemispherx the interest Hudson Bay, Cranshire, and Iroquois expressed in purchasing Hemispherx stock.

Mid-South, in turn, asserted four counterclaims against Hemispherx, seeking payment for its efforts in identifying and cultivating the investment of Hudson Bay, Cranshire, and Iroquois in Hemispherx. Specifically, Mid-South alleged counterclaims for breach of contract, promissory estoppel, quantum meruit, and unjust enrichment. In addition, Mid-South alleged a fifth counterclaim, against both Hemispherx and Hemispherx's investment advisor Sage, alleging fraud.

11

These claims are governed by Georgia law. In applying Georgia law, we endeavor here to decide the case the way the Georgia Supreme Court would. See Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co., 362 F.3d 1317, 1318 (11th Cir. 2004) (per curiam); see also Ernie Haier Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001).

At the outset of this litigation, the district court granted Hemispherx judgment on the pleadings as to Mid-South's breach-of-contract counterclaim. See Fed. R. Civ. P. 12(c). In doing so, the district court concluded that Mid-South's allegations that Hemispherx breached the Engagement Letter failed, as a matter of law, because Georgia's statute of frauds prevented Mid-South from enforcing the unsigned letter agreement against Hemispherx. Reviewing this decision de novo, accepting as true the facts alleged, and viewing those facts in the light most favorable to Mid-South, see Abdur-Rahman v. Walker, 567 F.3d 1278, 1280-81 (11th Cir. 2009), we reverse because Mid-South's allegations implicate an exception to the statute of frauds applicable when one party has performed under the unsigned contract and the other party has accepted that performance.

After the parties completed discovery, the district court next entered summary judgment in favor of Hemispherx and Sage on all of Mid-South's counterclaims. Summary judgment is appropriate only "if the movant shows that

12

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the summary judgment decision de novo, viewing the record in the light most favorable to the non-moving party. See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011).

Because we conclude that there remain disputed issues of material fact that a jury must resolve as to the business relationship between Mid-South and Hemispherx, we reverse summary judgment for Hemispherx on three of Mid-South's claims seeking to recover a commission under the equitable theories of promissory estoppel, quantum meruit, and unjust enrichment. But we affirm summary judgment for Hemispherx and Sage on Mid-South's fraud claims, which fail for several reasons.

Lastly, we affirm the district court's decision to grant Mid-South summary judgment on Hemispherx's claim that Mid-South tortiously interfered with Hemispherx's business relationships. Hemispherx failed to produce any evidence indicating that Mid-South was acting with malice and with an intent to injure Hemispherx when, after Hemispherx terminated Mid-South's efforts to raise capital, Mid-South nonetheless conveyed to Hemispherx the interest Hudson Bay, Cranshire, and Iroquois had expressed in purchasing Hemispherx stock.

13

Below, we explain in greater detail the reasons for our decision. Because Mid-South's counterclaims drive this litigation, we consider them first.

### III.  MID-SOUTH'S BREACH-OF-CONTRACT CLAIM

Mid-South alleged that Hemispherx, by its conduct, agreed to the terms of the unsigned Engagement Letter, and then breached that agreement by failing to pay Mid-South a commission according to the agreement's terms. The district court granted Hemispherx judgment on the pleadings on this claim. Hemispherx contends, on appeal, that Mid-South's allegations failed as a matter of law because they 1) failed adequately to state a claim that Hemispherx, by its conduct, assented to the terms of the Engagement Letter, and 2) even if Hemispherx was alleged to have assented to the Engagement Letter, that unsigned agreement was unenforceable against Hemispherx under the Georgia statute of frauds.[1] We disagree with both contentions.

### A.  Mid-South adequately pled that Hemispherx assented, by its conduct, to the Engagement Letter's terms

Under Georgia law, a party's conduct may bind him to the terms of a contract, even if he does not sign the agreement. See Comvest, L.L.C. v.

---

[1]The district court ruled only on the second argument, holding that the statute of frauds prevented Mid-South from enforcing the unsigned Engagement Letter against Hemispherx. But the panel must address both of Hemispherx's arguments before the Court remands this claim to the district court.

Corporate Secs. Grp. Inc., 507 S.E.2d 21, 24-25 (Ga. Ct. App. 1998).  Mid-South's

allegations that that occurred here—that Hemispherx assented, by its conduct, to

the terms of the Engagement Letter—are sufficient to survive Hemispherx's Rule

12(c) motion.  See generally Thompson v. Floyd, 713 S.E.2d 883, 890 (Ga. Ct.

App. 2011) (considering circumstances surrounding the making of a contract in

order to determine if the parties mutually assented to agreement's essential terms).

Mid-South alleged the following: Mid-South's Rosenstein and

Hemispherx's CEO, Dr. Carter, had preliminary discussions about Rosenstein

raising capital for Hemispherx.  Before Hemispherx authorized Rosenstein to

begin soliciting potential investors, however, Hemispherx requested a copy of

Mid-South's Engagement Letter.  Only after Rosenstein sent Hemispherx the

Engagement Letter did Dr. Carter authorize Mid-South to seek investors for

Hemispherx.  And only after receiving a copy of the Engagement Letter did

Hemispherx provide Mid-South with the information about Hemispherx that

Rosenstein needed to seek potential investors.  Throughout the ensuing eight

months, Hemispherx then actively participated in Mid-South's attempts to broker a

deal with several potential investors.

These allegations, only briefly summarized here, are sufficient to state a

plausible claim that Hemispherx assented, by its conduct, to the terms of the

15

unsigned Mid-South Engagement Letter.

## B. The statute of frauds does not foreclose enforcing the unsigned Engagement Letter against Hemispherx

Hemispherx further argues that even if it assented to the terms of the Engagement Letter, the statute of frauds bars Mid-South from enforcing that unsigned agreement against Hemispherx.  Georgia's statute of frauds requires, in pertinent part, that "[a]ny agreement that is not to be performed within one year from [its] making" must be in writing and signed by the party against whom the agreement is to be enforced.  Ga. Code Ann. § 13-5-30(5).  This statute applies here because the Engagement Letter, by its terms, could not be performed within one year.  Instead, that agreement obligated Hemispherx to pay a commission on any investment deal, occurring at least two years after the termination of the letter agreement, if the deal involved investors Mid-South had identified or introduced to Hemispherx during the term of the agreement.[2]  See Fowler v. Essex Co., 347

_____

[2]Specifically, this provision stated:

Notwithstanding any termination of this Engagement Letter pursuant to the terms hereof or otherwise, the obligation to pay the Fees and Compensation described in Section 2 shall survive any termination or expiration of the Agreement.  It is expressly understood and agreed by the parties hereto that any private financing of equity or debt or other capital raising activity of [Hemispherx] within twenty four (24) months of the termination or expiration of the Agreement, with any investors or lenders to whom [Hemispherx] was Identified or Introduced by [Mid-South] while the Agreement was in effect and disclosed to [Hemispherx] in writing, shall result in such fees and compensation due and payable by [Hemispherx] to [Mid-South] under the same terms of Section 2 above.  Upon completion of the Offering, any

16

S.E.2d 348, 349 (Ga. Ct. App. 1986) (holding that "[w]here the time within the contract to be performed depends on some contingency," the contract still falls within § 13-5-30(5) "provided[] the contingency cannot happen within the year") (quotation marks omitted).

Nevertheless, Georgia law recognizes an exception to the statute of frauds "where there has been performance on one side, accepted by the other in accordance with the contract." Ga. Code Ann. §13-5-31(2). Enforcing an unsigned agreement under this exception is premised on estoppel principles. See Nowell v. Mayor & Council of Monroe, 171 S.E. 136, 139 (Ga. 1933). The party seeking to enforce an unsigned agreement under this exception, therefore, must show "mutuality of action"; that is, that it performed one or more acts pursuant to and in furtherance of the contract sought to be enforced, and the other party accepted that performance pursuant to the agreement. See id. The act performed must be consistent with the existence of a contract, inconsistent with the lack of a

---

> future renegotiation, restructuring, revision or other amendment of such Offering by and between [Hemispherx] and the investors in such Offering which results in the receipt of any net new funds or commitment with respect thereto by [Hemispherx] from such investor(s) within twenty four (24) months of the completion of the Offering shall be deemed to be a new financing and shall result in additional fees and compensation due and payable by [Hemispherx] to [Mid-South] under the terms of Section 2 above.

(Doc. 49-2 at 5 ¶ 2(d).)

contract, and essential to the contract, such that it resulted in both a loss or injury to the party seeking to enforce the unsigned contract and a benefit to the other party.  See Hudson v. Venture Indus., Inc., 252 S.E.2d 606, 608 (Ga. 1979); Golden v. Nat'l Serv. Indus., 435 S.E.2d 270, 271 (Ga. Ct. App. 1993).  The question of whether there has been part performance sufficient to warrant application of this exception to the statute of frauds is generally one for the jury.  See Hathaway v. Bishop, 449 S.E.2d 318, 320 (Ga. Ct. App. 1994).

Accepting Mid-South's allegations as true, the circumstances presented here fall within this exception to the statute of frauds.  The Engagement Letter provided that Hemispherx was engaging Mid-South to act as its broker to solicit investors for Hemispherx.  After requesting and receiving the Engagement Letter, Hemispherx formally authorized Mid-South to begin seeking such investors.  The Engagement Letter provided that, to facilitate its efforts in soliciting investors, Hemispherx would provide Mid-South with accurate information about its business and financial condition, and Mid-South would keep this information confidential except as needed to solicit investors.  After receiving the Engagement Letter, Hemispherx provided Mid-South with the information it requested.  The Engagement Letter provided that Hemispherx would pay Mid-South a fee for investments in Hemispherx from investors that Mid-South identified or introduced

18

to Hemispherx.  After sending Hemispherx the Engagement Letter, and after Hemispherx authorized it to do so, Mid-South undertook efforts to identify potential investors for Hemispherx, present investment proposals to Hemispherx, and facilitate negotiations between the potential investors and Hemispherx. Hemispherx, in turn, considered the proposals Mid-South presented to it, actively participated in negotiations Mid-South arranged with these potential investors, and paid for an appraisal of its assets requested by one of the identified potential investors.  These allegations, accepted as true, establish that Mid-South performed according to the terms of the Engagement Letter, and that Hemispherx accepted that performance, sufficient to invoke the relevant exception to the statute of frauds.

The district court, in ruling to the contrary, concluded instead that "[t]he actions that MidSouth took, such as compiling a list of investors and discussing the Hemispherx investment opportunity with approximately forty investors, were basic steps that any sales broker would take with or without a contract."  (Doc. 91 at 6.)  But here our review is limited to Mid-South's allegations, which do not address the basic steps any sales broker would take, with or without a contract. Furthermore, Mid-South sufficiently alleged that it did much more than simply compile a list of potential investors and talk to them about investing in

19

Hemispherx.

For these reasons, the district court erred in granting Hemispherx judgment on the pleadings on Mid-South's breach-of-contract claim.

## IV.  MID-SOUTH'S EQUITABLE CLAIMS FOR RECOVERING A COMMISSION

Where a party cannot recover under a contract, Georgia law provides alternative equitable theories of recovery, including promissory estoppel, quantum meruit and unjust enrichment.  See Goldstein v. Home Depot U.S.A., Inc., 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009).  Mid-South invokes each of these equitable theories here as alternative means for recovering a commission from Hemispherx.  See id. (recognizing party can plead such equitable claims in the alternative to a breach-of-contract claim where at least one party contests the existence of a contract); see also Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C., 426 F. Supp. 2d 1356, 1371 (N.D. Ga. 2006).  Although at trial Mid-South cannot recover against Hemispherx under both its legal (breach-of-contract) and its equitable claims, Mid-South can plead these claims in the alternative and then elect at trial under which remedy it wants to proceed.  See McBride v. Life Ins. Co. of Va., 190 F. Supp. 2d 1366, 1378 (M.D. Ga. 2002) (applying Georgia law). The district court granted Hemispherx summary judgment on each of these three equitable claims.

20

## A. Promissory estoppel

Mid-South's unsigned Engagement Letter provided that Hemispherx would pay Mid-South a commission for "any investors Identified or Introduced" by Mid-South, directly or indirectly, regardless of who closed the deal involving these investors. (Doc. 49-2 at 4-5 ¶ 2(a).[3]) Mid-South asserts that, even if it is unable to convince a jury that it had a binding contract with Hemispherx, in the form of the unsigned Engagement Letter, Mid-South could still enforce the terms of that agreement against Hemispherx under a promissory estoppel theory. Hemispherx

---

[3]More specifically, this provision provided, in pertinent part, the following:

As compensation for services rendered and to be rendered hereunder by [Mid-South], [Hemispherx] agrees to pay [Mid-South] as follows:

An amount in cash equal to:

1) Five percent (5%) of the principal amount Sold to any investors Identified or Introduced by [Mid-South], with all such sums payable at the time of each closing (a "Closing") of the Placement ("Placement Fee"); . . . . Identified or Introduced includes direct and indirect introductions by [Mid-South] or its agents and representations including, without limitation, where a party introduced to [Hemispherx] introduces another party to [Hemispherx] who then purchases the securities sold pursuant to the Offering or introduces another investor who purchases securities in the Offering, and so on. For greater clarity, in the event of a dispute as to whether [Mid-South] Identified or Introduced an investor to [Hemispherx] in connection with the Offering, the following question shall be answered: But for the acts of [Mid-South], would the sale of the securities in the Offering have taken place? If the answer to that question is "No", then [Mid-South] shall be deemed to have Identified or Introduced that purchaser for purposes of earning the Placement Fee. The preceding test is not the exclusive test for determining whether the Placement fee is earned by [Mid-South] but is only an example.

(Doc. 49-2 § 2(a); see also id. at 5 § 2(b) (providing for stock warrants as further compensation).)

21

asserts that Mid-South's promissory estoppel claim fails for two reasons: 1) there is no evidence from which a jury could find that Hemispherx promised to pay Mid-South a commission according to the terms of the unsigned Engagement Letter and, 2) even if Hemispherx did make such a promise, it was unreasonable for Mid-South to rely on such a substantial promise which was never reduced to a signed writing.  We reject both of Hemispherx's contentions.

### 1. A jury could find that Hemispherx promised to pay Mid-South a commission according to the terms of the Engagement Letter

For its promissory estoppel claim to survive summary judgment, Mid-South first had to establish at least a genuine factual dispute as to whether Hemispherx promised to pay Mid-South a commission pursuant to the terms of the Engagement Letter.  See Ga. Code Ann. § 13-3-44(a).  "A promise is a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee understanding that a commitment has been made."  DPLM, Ltd. v. J.H. Harvey Co., 526 S.E.2d 409, 412 (Ga. Ct. App. 1999) (internal quotation marks omitted; citing Georgia precedent quoting Restatement (Second) of Contracts, § 2(1).)  A party's conduct can result in a promise.  See id.  Whether a party made a promise in a given case is generally a question of fact for the jury.  See Jones v. White, 717 S.E.2d 322, 329 (Ga. Ct. App. 2011).  As previously discussed, Mid-South sufficiently alleged that Hemispherx promised, by its conduct, to be bound

22

by the terms of Mid-South's Engagement Letter.  See supra Section III(A).  And, viewing the summary judgment evidence in the light most favorable to Mid-South, a jury could find those allegations to be true.  Moreover, there is evidence, viewed in the light most favorable to Mid-South, that indicated that, during their preliminary talks, Mid-South's Rosenstein and Hemispherx's Carter discussed Mid-South's compensation as it was set forth in the Engagement Letter, and Carter agreed to pay Mid-South accordingly.  Thus, a jury could find, based on the circumstances surrounding the parties' relationship, that Hemispherx promised to pay Mid-South according to the terms of the unsigned Engagement Letter.

**2.  A jury could find that Mid-South reasonably relied on Hemispherx's promise**

Mid-South must also show that it reasonably relied on Hemispherx's promise to pay Mid-South a commission according to the terms of the Engagement Letter.  See Ga. Code Ann. § 13-3-44(a); see also Griffin v. State Bank of Cochran, 718 S.E.2d 35, 42 (Ga. Ct. App. 2011).  Generally, the issue of a party's reasonable reliance is also a question of fact for the jury.  See Jones, 717 S.E.2d at 329.  That is true here, where Mid-South's evidence creates at least a triable issue as to whether its reliance on Hemispherx's promise was reasonable.

In concluding, instead, that Mid-South's reliance was, as a matter of law, unreasonable, the district court determined that the circumstances presented here

23

were analogous to those addressed by this court in Johnson v. University Health Services, Inc., 161 F.3d 1334 (11th Cir. 1998). But Johnson is distinguishable.

In Johnson, this court applied Georgia law to a promissory estoppel claim asserted by an obstetrician, Dr. Cherie Johnson, who practiced at an Augusta, Georgia, Hospital. Id. at 1336. According to Dr. Johnson, the hospital, through a series of phone calls between Dr. Johnson and several hospital officials, offered to contribute over $1 million to help finance Dr. Johnson's practice outside the hospital. Id. at 1337. We first rejected Dr. Johnson's breach-of-contract claim because the alleged oral agreement violated the statute of frauds. Id. at 1339-40.

Turning to Dr. Johnson's promissory estoppel claim, this court held the statute of frauds did not preclude that equitable claim. Id. at 1340. Nonetheless, we upheld the entry of summary judgment for the hospital on Dr. Johnson's promissory estoppel claim. This court recognized that "[p]romises that do not conform to the statute of frauds . . . will often be equally unenforceable under a promissory estoppel theory [because] [p]romissory estoppel requires that reliance on the promise be reasonable. [And] [i]t is usually unreasonable to rely on a substantial promise that has not been reduced to writing." Id. at 1340-41 (citation omitted). This court then applied that rule in Johnson, where the doctor based her claims that the hospital "offered her a complex, multi-faceted aid package worth

24

over $1 million . . . solely on a series of telephone conversations [she had] with

low-ranking [hospital] officials." Id. at 1341.

> In light of the size of the aid package, the limited authority of the
> persons with whom Dr. Johnson was speaking, and the somewhat
> ambiguous nature of their conversations, it would have been patently
> unreasonable for Dr. Johnson to act in reliance on the series of oral
> representations that she claims constituted a promise of financial
> assistance.

Id. at 1341; see also Reindel v. Mobile Content Network Co., 652 F. Supp. 2d

1278, 1291 (N.D. Ga. 2009) (applying Johnson to reject promissory estoppel claim

based on the "extraordinary" verbal promise to pay 5% of company's stock).

The circumstances presented in Johnson, however, are distinguishable from

those presented in this case, viewed in the light most favorable to Mid-South.

First, while the doctor in Johnson relied on telephone conversations she had with

"low-ranking [hospital] officials," 161 F.3d at 1341, Mid-South was instead

relying on promises made primarily by Hemispherx's CEO, Dr. Carter.  Second,

although the amount of fees Mid-South seeks to recover is substantial, those fees

are based upon a customary percentage used in the investment banking industry to

calculate fees.  The terms of the agreements Hemispherx signed with the other two

investment brokers bear this out.  Third, there was testimony from one of

Rodman's employees that it was commonplace in the investment industry for

parties to agree upon the terms included in an engagement agreement, but not to

25

sign that agreement until the investment deal was closed.  In fact, Hemispherx followed a similar course of dealing when Rosenstein previously raised capital for it in 2003.  At that time, Hemispherx signed a one-page agreement when it hired Rosenstein and then signed a full engagement letter at the time the deal closed.  Further, Dr. Carter testified at his deposition that he generally did not sign a fee agreement until he knew the terms of the investment deal to be closed.  Viewing this evidence in the light most favorable to Mid-South, these facts distinguish this case from Johnson and would support a jury finding here that Mid-South reasonably relied on Hemispherx's promise to pay Mid-South a commission according to the terms of the unsigned Engagement Letter.

### 3.  Conclusion as to Mid-South's promissory estoppel claim

Because there remain disputed issues of material fact that a jury must resolve, regarding whether Hemispherx promised to pay Mid-South according to the terms of the unsigned Engagement Letter and whether Mid-South reasonably relied on that promise, we reverse summary judgment for Hemispherx on Mid-South's promissory estoppel claim.

## B.  Quantum meruit and unjust enrichment

Mid-South also seeks to recover a commission from Hemispherx under the equitable theories of quantum meruit and unjust enrichment.  These related

26

equitable theories permit a party who cannot recover under a contract, nevertheless, to receive compensation for performing a valuable service (quantum meruit) or conferring a benefit on another (unjust enrichment). See Ga. Dep't of Cmty. Health v. Data Inquiry, LLC, 722 S.E.2d 403, 407 (Ga. Ct. App. 2012). The parties agree that, to recover under either theory in this case, Mid-South must establish, among other things, that it was the "procuring cause" of the May 2009 sales of Hemispherx stock to Hudson Bay, Cranshire, and Iroquois. See Amend v. 485 Properties, 627 S.E.2d 565, 567-68 (Ga. 2006) (quantum meruit). In granting Hemispherx summary judgment on these claims, the district court concluded that Mid-South failed to submit evidence from which a jury could find that it was the procuring cause of these stock sales. We disagree.

There are two ways that Mid-South can establish that it was the procuring cause: by showing that 1) at the time Rodman closed the stock sales for Hemispherx, there were pending negotiations between Mid-South and these investors, of which Hemispherx was aware; or that 2) Hemispherx interfered with Mid-South's efforts to close an investment deal for Hemispherx involving these investors. See Centre Pointe Invs., Inc. v. Frank M. Darby Co., 549 S.E.2d 435, 438 (Ga. Ct. App. 2001). As to each, there remain disputed issues of fact that a jury must resolve, precluding summary judgment.

27

### 1. Pending negotiations

"To prove that it was the procuring cause . . . , a broker ordinarily must show that there were negotiations still pending between the broker and the prospective [investor] and that [the broker's client] was aware that negotiations were still pending at the time [the client] consummated the [investment deal]." Id. (internal quotation marks omitted).  The evidence, viewed in the light most favorable to Mid-South, showed the following: In late April and early May 2009, Mid-South was negotiating with Hudson Bay, Cranshire, and Iroquois, on Hemispherx's behalf, for investments that included the purchase of Hemispherx stock.  More specifically, at the end of April, Hemispherx proposed selling $1 million in stock to Hudson Bay.  At about the same time, Cranshire and Iroquois proposed buying $1 million in Hemispherx stock.  On May 8, Hudson Bay proposed buying $5 million in stock.  The same day, Cranshire proposed a stock deal for $3 million.  Just three days later, Rodman brokered the sale of $15 million in stock to Hudson Bay and another investor.  A week after that, Rodman brokered a $16 million stock deal with Cranshire and Iroquois.  At the time Rodman brokered these stock sales, Hemispherx had not rejected the earlier pending stock offers involving these potential investors which had been brought to Hemispherx by Mid-South.  This evidence is sufficient to create a triable issue as

28

to whether Mid-South was the procuring cause of the May 2009 stock purchases made by these three investors.

The district court concluded, to the contrary, that once Hemispherx notified Mid-South, on May 4, to suspend its capital-raising efforts for Hemispherx, there were, as a matter of law, no longer any negotiations pending between Mid-South and these investors. But Mid-South's evidence was sufficient to create a triable issue of fact as to whether Hemispherx suspended Mid-South's efforts to raise capital in order to replace Mid-South in the negotiations with heavy hitter Rodman. If so, a jury could find that Mid-South should still be deemed the procuring agent of the deals closed by Rodman. Cf. Centre Pointe, 549 S.E.2d at 436-39 (holding evidence supported jury's finding that broker was a procuring cause for a commercial lease where broker brought landlord and tenant together and facilitated their negotiations, but tenant terminated broker seven days before agreeing to the lease, informing only the landlord and not the broker of the termination).

This court, applying Florida law, reached a similar conclusion in BKR Global, LLC v. FourWinds Capital Management, 661 F.3d 1134 (11th Cir. 2011). In that case, FourWinds entered into a consulting agreement with BKR Global, "an experienced timber investment consulting firm," under which BKR agreed to

29

seek investment opportunities for FourWinds in the timber industry. Id. at 1135-36. BKR Global then introduced FourWinds to Nemus, and FourWinds and Nemus began negotiating a deal. Id. at 1136. Soon thereafter FourWinds terminated its consulting agreement with BKR Global. Id. A few weeks later, FourWinds and Nemus closed an investment deal. Id. When BKR Global demanded that FourWinds pay BKR Global a commission for introducing FourWinds to Nemus, FourWinds refused to pay, stating that its deal with Nemus was the result of a "cold-call[]" FourWinds had made on its own to Nemus. Id.

The "central issue" in BKR Global, as defined by the terms of the consulting contract between FourWinds and BKR Global, was "whether FourWinds pursued an investment opportunity that [BKR] introduced." Id. at 1136 (internal quotation marks omitted). Recognizing that the questions of "whether the investment opportunity pursued by FourWinds is covered by its agreement with BKR" and "whether a broker is the 'procuring cause' of the ultimate transaction between the two parties" are both questions of fact to be resolved by a jury, id. at 1137, we held that the evidence "create[d] a triable issue of fact as to whether the investment opportunity FourWinds pursued with Nemus was materially different from that presented to it by BKR," id. at 1136. Georgia law would support applying the same reasoning here. See Centre Pointe, 549

30

S.E.2d at 436-39.

## 2. Seller's interference

The second way that Mid-South can establish that it was the procuring cause of the May 2009 stock sales is to show that Hemispherx interfered with Mid-South's negotiations with Hudson Bay, Cranshire, and Iroquois for the sale of Hemispherx stock.

> [W]here [the client] knowingly interferes with the negotiations between the [investors] and the broker, it becomes unnecessary to show negotiations were pending when the [investment deal] was consummated. . . . The broker can thus make out a prima facie case by showing that negotiations for the [investment] were set on foot through [its] efforts, that [the broker] performed every service required by his employment which it was possible to perform, and that the failure on [its] part to personally consummate the trade was due to the interference of [the client].

Id. at 438 (internal quotation marks omitted). "Although a broker does not establish he was the procuring cause by merely showing he first located the ultimate [investor], a broker can make out a case if he can show interference by the [client] and no abandonment of his efforts to effectuate the [investment]." Perimeter Realty v. GAPI, Inc., 533 S.E.2d 136, 148 (Ga. Ct. App. 2000).

Again, viewing the evidence in the light most favorable to Mid-South, Mid-South has established a triable issue of fact as to whether, without Hemispherx's interference, Mid-South would have closed the stock deals it was pursuing with

Hudson Bay, Cranshire, and Iroquois at the time Hemispherx suspended Mid-South's efforts on its behalf and replaced Mid-South with Rodman.  See Centre Pointe, 549 S.E.2d at 438 (holding there was sufficient evidence for the jury to find that the broker was the procuring cause of a lease where, among other things, the timing and circumstances of the lease were suspicious, occurring just seven days after the lessor terminated the broker); Perimeter Realty, 533 S.E.2d at 148 (holding summary judgment was not appropriate were the brokers' efforts brought principals together, after which the principals negotiated a sale, after telling the brokers that there was nothing more for them to do); Bowers v. Greene, 458 S.E.2d 150, 152 (Ga. Ct. App. 1995) (holding summary judgment was inappropriate on question of whether brokers were the procuring cause of a sale they did not close, because jury could find brokers did not close the sale after the owner directed them to cease their involvement in the sales).  The district court erred, therefore, in granting Hemispherx summary judgment on Mid-South's claims for quantum meruit and unjust enrichment.[4]

## V.  MID-SOUTH'S FRAUD CLAIMS

The district court did not err in granting Sage and Hemispherx summary

---

[4]Before the district court, Hemispherx also argued that Mid-South's unjust enrichment claim failed as a matter of law because Mid-South did not establish that it conferred a benefit on Hemispherx.  Hemispherx does not reassert that argument on appeal, but we conclude, in any event, that a jury could find that Mid-South did confer a benefit on Hemispherx.

32

judgment on Mid-South's fraud claims.  Those claims fall into two categories:

1) misrepresentations Hemispherx and Sage purportedly made to Mid-South after Hemispherx engaged the second broker, Cato, in November 2008; and

2) misrepresentations Hemispherx purportedly made to Mid-South when Hemispherx suspended Mid-South's capital-raising efforts in May 2009.

**A.  Misrepresentations Hemispherx and Sage made to Mid-South after Hemispherx hired the second broker, Cato, in November 2008**

Regarding Hemispherx's hiring Cato, the evidence, viewed in the light most favorable to Mid-South, established the following:        After authorizing Mid-South in September 2008 to act on a non-exclusive basis to seek investors on its behalf, Hemispherx, unbeknownst to Mid-South, engaged a second broker, Cato, on November 19, 2008.  In December 2008 and January 2009, Hemispherx's financial advisor, Sage, through Wayne Pambianchi, engaged in several communications with Mid-South, as well as Cato, regarding the payment of commissions.

Through these communications, Pambianchi informed Mid-South's Cabibi that Hemispherx was "considering" engaging another investment broker (Doc. 127-6 ¶ 7), and Pambianchi asked Mid-South to provide him a list of investors Mid-South had already contacted and for which Mid-South would claim a commission.  Cabibi provided Pambianchi with such a list in December 2008, and

33

then, at Pambianchi's request, updated that list on January 9, 2009.

Pambianchi apparently requested the same information from Cato. Cato's and Mid-South's lists included several of the same potential investors, including Hudson Bay, Cranshire, and Iroquois. "To avoid conflicts and respect everyone's efforts," Pambianchi informed Mid-South that he had "annotated the list you sent. There are a very few overlaps and where there are, I suggest a split, the % being what I propose you get of your fees you would otherwise receive. I propose eliminating a few, as I have done with the other group, because they seem more engaged." (Doc. 127-6 at 16.) Pambianchi, thus, crossed several potential investors off each broker's list and included percentages next to several other listed investors.

Neither Mid-South nor Cato agreed with this proposal. But Mid-South indicated to Pambianchi that he should do what was best for Hemispherx, and suggested, twice, that Pambianchi arrange a conference call so Cato and Mid-South could share information in order to close a deal for Hemispherx. Pambianchi never responded to Mid-South and the matter of a possible fee dispute between Cato and Mid-South was never raised again.

Before the district court, Mid-South, in support of its fraud claims, made a variety of assertions. On appeal, however, Mid-South appears to argue only that

34

Pambianchi misrepresented to Mid-South that it would earn a split commission for investors both Mid-South and Cato had contacted, when in fact Hemispherx did not intend to pay both brokers a split fee if an investor contacted by both ultimately invested in Hemispherx.

Mid-South's claim fails as a matter of law, for several reasons. A claim for fraud requires proof of "1) a false representation or omission of material fact; 2) scienter; 3) intent to induce the party claiming fraud to act or refrain from acting; 4) justifiable reliance; and 5) damages." Collins v. Regions Bank, 639 S.E.2d 626, 628 (Ga. Ct. App. 2006). Here, it is not clear that Pambianchi made the false statement Mid-South attributes to him. The excerpt from Pambianchi's deposition on which Mid-South relies to support this fraud claim indicates only that, if an investor contacted by both Mid-South and Cato ultimately invested in Hemispherx, Hemispherx would pay Cato a commission based on the percentage of its involvement, but Pambianchi did not know what, if any, commission Hemispherx would pay Mid-South because Pambianchi was unaware of the terms of Hemispherx's agreement with Mid-South. That is not surprising because, as this lawsuit illustrates, Mid-South and Hemispherx themselves disagree as to the terms of their business relationship.

Even if Pambianchi made the false representation Mid-South attributes to

35

him, the undisputed evidence failed to establish that Mid-South ever relied upon Pambianchi's suggested fee split.  Instead, the undisputed evidence indicated that Mid-South never changed or altered any of its efforts to raise capital for Hemispherx based on Pambianchi's suggested fee split.  Mid-South had already been seeking investors for Hemispherx before Pambianchi raised the possibility of a fee split, and Mid-South continued to do so after rejecting Pambianchi's suggestion.

Even if Mid-South did rely on Pambianchi's suggested fee split, that reliance would not have been justified because neither Mid-South nor Cato agreed to Pambianchi's suggestion, and the possible fee dispute between Mid-South and Cato was never resolved.  Finally, for similar reasons, Mid-South has failed to show any harm from its reliance on Pambianchi's suggested fee split.  A fee dispute never arose between Mid-South and Cato.[5]  Further, Mid-South has not shown that it continued its efforts to seek investors for Hemispherx based on anything Pambianchi said.  Rather, Mid-South was already engaged in seeking investors for Hemispherx before Pambianchi initiated his December 2008 and

---

[5]Cato has, however, sued Hemispherx in federal district court in Delaware, also seeking to recover a commission on the stock sales Rodman brokered with Hudson Bay, Cranshire, and Iroquois.  See Cato Capital LLC v. Hemispherx Biopharma Inc., No. 1:09-cv-00549-GMS (D. Del.).  Currently, that litigation is at the summary judgment stage, with several summary judgment motions at issue.

36

January 2009 communications with Mid-South, and Mid-South did not alter its capital-raising efforts after Pambianchi's suggested a fee split.

Mid-South also may be arguing, on appeal, that Pambianchi's statement about splitting a fee indicated to Mid-South more generally that it would be paid a commission for any investor it introduced to Hemispherx, when in fact Hemispherx did not intend to pay Mid-South a fee. But there is no evidence in the record that Hemispherx did not intend to pay Mid-South any commission at that time. For these reasons, the district court did not err in granting Hemispherx and Sage summary judgment on this fraud claim.

## B. Misrepresentations Hemispherx made to Mid-South when it informed Mid-South to cease its capital-raising activities on Hemispherx's behalf

In another fraud claim asserted against Hemispherx, Mid-South alleged the following: On May 4, 2009, Dr. Carter, on Hemispherx's behalf, misrepresented to Mid-South that Hemispherx was suspending Mid-South's efforts to raise capital for Hemispherx because Hemispherx instead "was attempting to close a 'strategic alliance' with another pharmaceutical company that would result in raising all the capital needed and would be non-dilutive of existing shares." (Doc. 49 ¶ 97.) This was untrue. Hemispherx, instead, intended to hire Rodman exclusively to sell Hemispherx's stock. Mid-South relied upon Dr. Carter's misrepresentation to its detriment "by refraining from actively seeking additional offers and/or

37

enhancements or changes in terms to the offers previously made by Cranshire, Iroquois and Hudson Bay."  (Id. ¶ 99.)

The district court correctly concluded that the evidence did not establish that what Dr. Carter told Mid-South was false.  Dr. Carter, in his deposition, testified that, at this time, Hemispherx had discussion with several pharmaceutical companies about licensing agreements that, though "marginally dilutive," would raise capital and not involve the sale of Hemispherx stock.  (Doc. 124-4 at38-39.)

A jury, nevertheless, could find that, although the reason Dr. Carter told Mid-South to cease its capital-raising efforts was not false, it was also not the real reason Hemispherx wanted Mid-South to stop its capital-raising activities for Hemispherx.  Even so, Mid-South has failed to establish that the reason Dr. Carter gave Mid-South to explain why Hemispherx wanted Mid-South to stop seeking capital for it was material or that Mid-South justifiably relied on that stated reason to its detriment.  Said another way, Mid-South failed to establish that, had Hemispherx informed Mid-South of the real reason Hemispherx wanted Mid-South to cease its capital-raising activities, because Hemispherx intended to hire Rodman, a heavy hitter, to broker the sale of its stock instead, that Mid-South would have disregarded Hemispherx's instructions to cease seeking capital and would have continued trying to raise capital for Hemispherx.  For these reasons,

38

therefore, the district court did not err in granting Hemispherx summary judgment on this fraud claim.[6]

## VI.  HEMISPHERX'S CLAIM THAT MID-SOUTH AND ITS EMPLOYEES INTENTIONALLY INTERFERED WITH HEMISPHERX'S BUSINESS RELATIONSHIPS

Hemispherx alleged that Mid-South, Rosenstein, and Cabibi ("Mid-South Defendants") tortiously interfered with Hemispherx's business relationship with its potential investors and with Rodman.  The district court correctly concluded that the Mid-South Defendants were entitled to summary judgment on this claim because Hemispherx failed to assert any evidence on which a jury could find that Mid-South had acted with malice and with the intent to injure Hemispherx.  See State Farm Mut. Auto. Ins. Co. v.  Hernandez Auto Painting & Body Works, Inc., 719 S.E.2d 597, 600 (Ga. Ct. App. 2011) (recognizing this as an element of a tortious interference claim); see also White v. Shamrock Bldg. Sys., Inc., 669 S.E.2d 168, 173-74 (Ga. Ct. App. 2008) (noting malice, in this context, "means any unauthorized interference or interference without legal justification or excuse").  Viewed in the light most favorable to Hemispherx, the evidence indicated only that, after Dr. Carter fired Mid-South as its investment broker,

---

[6]For these same reasons, Mid-South failed to support its fraud claim with sufficient specificity to create a triable issue of fact sufficient to survive summary judgment.  See McLean v. Haden, 448 S.E.2d 69, 70 (Ga. Ct. App. 1994).

Hudson Bay, with which Mid-South had been negotiating on Hemispherx's behalf, conveyed to Mid-South's Cabibi an offer to buy Hemispherx stock. Cabibi listened to that offer and passed it on to Hemispherx. That conduct, as a matter of Georgia law, does not constitute an intentional interference with Hemispherx's business relationships.

## VIII.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision granting summary judgment to Mid-South on Hemispherx's tortious interference claim. We also AFFIRM summary judgment for Hemispherx and Sage on Mid-South's fraud claims. But we REVERSE judgment entered on the pleadings for Hemispherx on Mid-South's breach-of-contract claim, and we REVERSE summary judgment for Hemispherx on Mid-South's promissory estoppel, quantum meruit, and unjust enrichment claims, and REMAND these claims to the district court for proceedings consistent with this decision.